NATIONAL LABOR RELATIONS BOARD *v.* VIRGINIA ELECTRIC & POWER CO.*

No. 25. Argued November 13, 1941.—Decided December 22, 1941.

---

* Together with No. 26, *National Labor Relations Board* v. *Independent Organization of Employees of the Virginia Electric & Power Co.*, also on writ of certiorari, 312 U. S. 677, to the Circuit Court of Appeals for the Fourth Circuit.

470

*Mr. Robert B. Watts,* with whom *Assistant Solicitor General Fahy* and *Messrs. Richard S. Salant, Laurence A. Knapp, Morris P. Glushien,* and *Owsley Vose* were on the brief, for petitioner.

*Messrs. T. Justin Moore* and *George D. Gibson* for respondent in No. 25. *Mr. William Earle White,* with whom *Mr. Paul E. Hadlick* was on the brief, for respondent in No. 26.

MR. JUSTICE MURPHY delivered the opinion of the Court.

Upon the usual proceedings[1] had pursuant to § 10 of the National Labor Relations Act,[2] the Board made substantially the following findings of fact:

For years prior to the events in this case the Virginia Electric and Power Company (hereinafter called the Com-

---

[1] These proceedings were instituted on charges and amended charges filed in 1937 and 1938 by the Transport Workers Union of America, affiliated with the Congress of Industrial Organizations, by the Amalgamated Association of Street, Electrical Railway, and Motor Coach Employees of America, and by the International Brotherhood of Electrical Workers, the latter two being affiliated with the American Federation of Labor. The complaint, as amended, charged that the employer, respondent in No. 25, had engaged in unfair labor practices within the meaning of § 8 (1), (2), and (3) of the Act; 29 U. S. C. § 158 (1), (2), and (3). The Independent Organization of Employees of the Virginia Electric and Power Company, respondent in No. 26, was allowed to intervene with respect to the 8 (2) charge, was represented by counsel and participated throughout the proceedings.

[2] 49 Stat. 449; 29 U. S. C. § 151 *et seq.*

pany) was hostile to labor organizations. From 1922, when a strike was unsuccessful by a nationally affiliated union,[3] until the formation of the Independent Organization of Employees (hereinafter called the Independent) in 1937, there was no labor organization among its employees. Shortly after the enactment of the National Industrial Recovery Act in 1933, Holtzclaw, the president of the Company, spoke to the employees and stated that any organization among them was "entirely unnecessary." Until his death, in May 1937, the Company utilized the services of one Walters, an employee of the Railway Audit and Inspection Company, who, prior to the effective date of the Act, admittedly furnished a report on the labor activity of the employees to the Company. In 1936, Bishop, Superintendent of Transportation in Norfolk, interrogated employees concerning union activities. On April 26, 1937, shortly after the Act was upheld,[4] and an A. F. of L. organizer had appeared, the Company posted a bulletin[5] throughout its operations, appealing to the

---

[3] Amalgamated Association of Street, Electrical Railway, and Motor Coach Employees of America.

[4] *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, and companion cases.

[5] The bulletin read as follows:

"April 26, 1937.

*To the Employees of the Company:*

As a result of recent national labor organization activities and the interpretation of the Wagner Labor Act by the Supreme Court, employees of companies such as ours may be approached in the near future by representatives of one or more such labor organizations to solicit their membership. Such campaigns are now being pressed in various industries and in different parts of the country and strikes and unrest have developed in many localities. For the last fifteen years this Company and its employees have enjoyed a happy relationship of mutual confidence and understanding with each other, and during this period there has not been any labor organization among our employees in any department, so far as the management is aware. Under these circumstances, we feel that our employees are entitled to

employees to bargain with the Company directly, without the intervention of an "outside" union, and thereby coerced its employees. In response to this bulletin several requests for increased wages and better working conditions were received.[6] The Company decided to withhold action on those requests, and directed its employees to select representatives to attend meetings at which Company officials would speak on the Wagner Act. These representa-

---

know certain facts and have a statement as to the Company's attitude with reference to this matter.

The Company recognizes the right of every employee to join any union that he may wish to join, and such membership will not affect his position with the company. On the other hand, we feel that it should be made equally clear to each employee that it is not at all necessary for him to join any labor organization, despite anything he may be told to the contrary. Certainly, there is no law which requires or is intended to compel you to pay dues to, or to join any organization.

This Company has always dealt with its employees in full recognition of the right of every individual employee, or group of employees, to deal directly with the Company with respect to matters affecting their interests. If any of you, individually or as a group, at any time, have any matter which you wish to discuss with us, any officer or department head will be glad, as they always have been, to meet with you and discuss them frankly and fully. It is our earnest desire to straighten out in a friendly manner, as we have done in the past, whatever questions you may have in mind. It is reasonable to believe that our interests are mutual and can best be promoted through confidence and cooperation.

(signed)   J. G. Holtzclaw,<br>President."

[6] Included in those requests was a petition from a majority of the Norfolk transportation employees which was the result of two meetings on Company property during working hours on May 11, 1937, in response to unsigned notices placed in the dispatcher's office by A. R. Ruett, a car operator. Both Ruett, and R. E. Elliott, who assumed the leadership in those meetings, testified that Superintendent Bishop had urged them to form an inside organization after warning them against the C. I. O. Bishop denied this, and the Board made no finding.

tives met in Norfolk and Richmond on May 24, and were addressed by high Company officials, who read identical speeches [7] stressing the desirability of forming a bargain-

[7] "A substantial number of its employees representing various departments and various occupations have approached the Company with the request that the Company consider with them the matter of their working conditions and wages. In other words, they have requested collective bargaining. The Company's position with respect to this was recently stated in a posted bulletin.

"In a company such as ours, if an individual operator, for example, should ask for himself better working conditions or wages, this Company could not comply with his request without also making the same concessions to other similar operators. In such a case the operator who appealed individually would, as a practical matter, be bargaining collectively for all of his group, which is not the logical procedure.

"This Company is willing to consider the requests mentioned above but feels that, in fairness to all of its employees and to itself, it should at the same time consider other groups who have not yet come to it. If the approaching negotiations are to be intelligent and fair to all properly concerned, they should be conducted in an orderly way, and all interested groups should be represented in these discussions by representatives of their own choosing, as provided in the Wagner National Labor Relations Act, which provides as follows:

" 'SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.'

"The Wagner Act applies only to employees whose work is in or directly affects interstate commerce and to companies engaged in interstate commerce. Counsel for this Company advise us that in their opinion the provisions of the Act do not apply to local transportation employees, to gas employees in Norfolk, or to certain strictly local employees of the light and power department. In spite of this, the Company wants to make it perfectly clear that its policy is one of willingness to bargain with its employees in any manner satisfactory to the majority of its employees and that no employee will be discriminated against because of any labor affiliations he desires to make.

"The petitions and representations already received indicate a desire on the part of these employees at least to do their own bargaining,

ing agency. At the Richmond meeting it was announced that any wage increase granted would be retroactive to June 1. By the substance of the speeches and the mechanics of the meetings, the Company gave impetus to, and assured the creation of, an "inside" organization, and coerced its employees in the exercise of their rights guaranteed by § 7 of the Act. Meetings, arranged with the coöperation of Company supervisors, on Company property, and, in some instances, on Company time, followed, at which the May 24 speeches were reported to the men who voted to form an "inside" organization and selected committees for that purpose. These committees met on Company property until June 15, when the constitution of the Independent was adopted.

While the Independent was in the process of organization, Edwards, a supervisor, kept meetings of a rival C. I. O. union under surveillance and warned employees that they would be discharged for "messing with the C. I. O." On June 1, Mann, a member of the C. I. O. who had openly protested against an "inside" union at one of the May 11 meetings (see note 6 *ante*) attended by Superintendent Bishop's son, Warren, was discharged for union activities.

---

and we are taking this means of letting you know our willingness to proceed with such bargaining in an orderly manner. In order to progress, it would seem that the first step necessary to be taken ·by you is the formation of a bargaining agency and the selection of authorized representatives to conduct this bargaining in such an orderly manner.

"The Wagner Labor Act prohibits a company from 'dominating or interfering with the formation or administration of any labor organization or contributing financial or other support to it.'

"In view of your request to bargain directly with the Company and, in view of your right to self-organization as provided in the law, it will facilitate negotiations if you will proceed to set up your organization, select your own officers and advisers, adopt your own by-laws and rules, and select your representatives to meet with the Company officials whenever you desire."

On June 17, application cards for the Independent were distributed throughout the entire system of the Company, and many were signed on Company property and time. Within three weeks after the adoption of the constitution of the Independent, a majority of the employees filled out application cards. By July 13, the organization was complete, and permanent committeemen had been elected. A majority of those committeemen had been present at the May 24 meetings. On July 19, the Independent notified the Company that it represented a majority of the employees, and submitted a proposed contract. Negotiations were begun on July 30, and agreement was reached by midnight of the following day. The contract was formally executed on August 5, and provided, *inter alia*, for a closed shop, a check-off, and a wage increase. On August 20, the Company paid $3,784.50 to the Independent, although it had not yet deducted that entire amount from the employees' wages. On November 4, the date upon which the closed shop provision became effective, the Company discharged two employees, Staunton and Elliott, because they refused to join the Independent. In March, 1938, it discharged another employee, Harrell, for his membership and activity in an outside union.

Upon the basis of these findings and the entire record in the case, the Board concluded that the Company had committed unfair labor practices within the meaning of § 8 (1), (2) and (3) of the Act. Its order directed the Company to cease and desist from its unfair labor practices and from giving effect to its contract with the Independent, to withdraw recognition from and disestablish that organization, to reinstate with back pay the four wrongfully discharged employees, to reimburse each of its employees who was a member of the Independent in the amount of the dues and assessments checked off his wages by the Company on behalf of the Independent, and to post appropriate notices.

The Company and the Independent filed separate petitions in the court below to review and set aside the Board's order. The Board answered and requested enforcement of its order against the Company. The court below denied enforcement to any part of the Board's order, completely setting it aside.[8] We granted the petition for writs of certiorari because the case was thought to present important questions in the administration of the Act. 312 U. S. 677.

The Company is engaged in the business of generating and distributing electrical energy in eastern Virginia and north-eastern North Carolina. It also furnishes illuminating gas to customers in the vicinity of Norfolk, Virginia, and operates transportation services in Richmond, Norfolk, Portsmouth and Petersburg. It does not here renew the contention, correctly decided against it by the court below,[9] that the jurisdiction of the Board does not extend to its employees in the gas and transportation departments.

### Domination of the Independent

The command of § 10 (e) of the Act that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive," precludes an independent consideration of the facts. Bearing this in mind, we must ever guard against allowing our views to be substituted for those of the agency which Congress has created to administer the Act. But here the Board's conclusion that the Independent was a company-dominated union seems based heavily upon findings which are not free from ambiguity and doubt. We believe that the Board, and not this Court, should undertake the task of clarification.

The Board specifically found that the bulletin of April 26 and the speeches of May 24 "interfered with, re-

---

[8] *Virginia Electric & Power Co.* v. *National Labor Relations Board,* 115 F. 2d 414.

[9] *Ibid.,* 415–416.

strained and coerced" the Company's employees in the exercise of their rights guaranteed by § 7 of the Act. The Company strongly urges that such a finding is repugnant to the First Amendment. Neither the Act nor the Board's order here enjoins the employer from expressing its view on labor policies or problems, nor is a penalty imposed upon it because of any utterances which it has made. The sanctions of the Act are imposed not in punishment of the employer but for the protection of the employees. The employer in this case is as free now as ever to take any side it may choose on this controversial issue. But, certainly, conduct, though evidenced in part by speech, may amount, in connection with other circumstances, to coercion within the meaning of the Act. If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways. For "Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure." *International Association of Machinists* v. *National Labor Relations Board*, 311 U. S. 72, 78.

If the Board's order here may fairly be said to be based on the totality of the Company's activities during the period in question, we may not consider the findings of the Board as to the coercive effect of the bulletin and the speeches in isolation from the findings as respects the other conduct of the Company. If the Board's ultimate conclusion is based upon a complex of activities, such as the anti-union background of the Company, the activities of Bishop, Edwards' warning to the employees that they would be discharged for "messing with the

C. I. O.," the discharge of Mann, the quick formation of the Independent, and the part which the management may have played in that formation, that conclusion would not be vitiated by the fact that the Board considered what the Company said in conjunction with what it did. The mere fact that language merges into a course of conduct does not put that whole course without the range of otherwise applicable administrative power. In determining whether the Company actually interfered with, restrained, and coerced its employees, the Board has a right to look at what the Company has said, as well as what it has done.

But, from the Board's decision, we are far from clear that the Board here considered the whole complex of activities, of which the bulletin and the speeches are but parts, in reaching its ultimate conclusion with regard to the Independent. The Board regarded the bulletin, on its face, as showing a marked bias against national unions by implying that strikes and unrest are caused by the organizational campaigns of such bodies, by stressing the "happy relationship of mutual confidence and understanding" prevailing in the absence of organization since the defeat of the Amalgamated in 1922, and by emphasizing the negative "right" of the employees to refrain from exercising their rights guaranteed under the Act, after paying "lip service" to those rights. Summing up its conclusions, the Board said: "We interpret the bulletin as an appeal to the employees to bargain with the respondent directly, without the intervention of any 'outside' union. We find that by posting the bulletin the respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

The Board was of the view that the speeches delivered in the meetings of May 24 provided the impetus for the formation of a system-wide organization, that they re-

emphasized the Company's distaste for "outside" organizations by referring to the bulletin, and that, after quoting the provision of the Act forbidding employer domination of labor organizations, they suggested that the employees select their "own" officers, and adopt their "own" by-laws and rules. The Board's finding was: "We find that at the May 24 meetings the respondent urged its employees to organize and to do so independently of 'outside' assistance, and that it thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

It is clear that the Board specifically found that those utterances were unfair labor practices, and it does not appear that the Board raised them to the stature of coercion by reliance on the surrounding circumstances. If the utterances are thus to be separated from their background, we find it difficult to sustain a finding of coercion with respect to them alone. The bulletin and the speeches set forth the right of the employees to do as they please without fear of retaliation by the Company. Perhaps the purport of these utterances may be altered by imponderable subtleties at work, which it is not our function to appraise. Whether there are sufficient findings and evidence of interference, restraint, coercion, and domination, without reference to the bulletin and the speeches, or whether the whole course of conduct, evidenced in part by the utterances, was aimed at achieving objectives forbidden by the Act, are questions for the Board to decide upon the evidence.

Here, we are not sufficiently certain from the findings that the Board based its conclusion with regard to the Independent upon the whole course of conduct revealed by this record. Rather, it appears that the Board rested heavily upon findings with regard to the bulletin and the speeches, the adequacy of which we regard as doubtful. We therefore remand the cause to the Circuit Court of Appeals with directions to remand it to the Board for a

redetermination of the issues in the light of this opinion. We do not mean to intimate any views of our own as to whether the Independent was dominated, or suggest to the Board what its conclusion should be when it reconsiders the case. Since the Board rested the remainder of its order in large part on its findings with respect to the domination of the Independent, we do not at this time reach the other parts of the Board's order, including the command that the checked-off dues and assessments should be refunded.

*Reversed and remanded.*

MR. JUSTICE ROBERTS and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.