290 F.2d 799
 Mary KIMBRELL, Mildred Poteat, Shirley Morgan, Ruth Vinson,
Ruby Coggins and Lucy Daniel, for themselves and other
employees of Jolog Sportswear, Inc., similarly situated who
may appear and participate herein, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
International Ladies' Garment Workers' Union, Intervenor.
 No. 8266.
 United States Court of Appeals Fourth Circuit.
 Argued April 3, 1961.
Decided June 3, 1961.
 
 Thomas A. Evins and J. Davis Kerr, Spartanburg, S.C. (Kerr & Evins, Spartanburg, S.C., on brief), for petitioners.
 
 
 1
 Melvin Pollack, Attorney, National Labor Relations Board, Washington, D.C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Morton Namrow, Attorney, National Labor Relations Board, Washington, D.C., on brief), for respondent. Morris P. Glushien, General Counsel, International Ladies' Garment Workers' Union, New York City (Julius Topol, Asst. General Counsel, International Ladies' Garment Workers' Union, New York City, on brief), for intervenor.
 
 
 2
 Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and HARRY E. WATKINS, District Judge.
 
 SOPER, Circuit Judge
 
 3
 This case comes before the court on petition of certain employees of Jolog Sportswear, Inc., a subsidiary of Jonathan Logan, Inc., to review a decision and order of the National Labor Relations Board whereby the Board dismissed a charge of Pearl Wyatt, an employee, that the corporations had engaged in unfair labor practices in violation of the National Labor Relations Act. The charge was that the corporations had supported and cooperated with the International Ladies' Garment Workers' Union in its efforts to organize to employees of the Jolog plant at Spartanburg, South Carolina, and had thereby interfered with the employees in the exercise of their right to bargain collectively through representatives of their own choosing. A hearing of the charge was held by a trial examiner who sustained the accusation and recommended that the Board issue an appropriate cease and desist order; but upon exceptions the Board overruled the examiner's recommendations and dismissed the complaint.
 
 
 4
 The union was the representative of Jonathan Logan employees in various other plants in the United States and on account of the coverage clause in its New York contract with the company it demanded recognition in Spartanburg. The corporation objected and later it was agreed that the union had no such right until it obtained the consent of the majority of the employees. Thereafter, in January 1959, the union began an organizing campaign and Elmer T. Kehrer, the regional director, requested and secured permission from Irving Hochberg, general manager of Jonathan Logan, to make a speech to the Spartanburg employees in the plant in order to persuade them to join the union. On January 22, 1959, the employees were assembled in the company's cafeteria and Hochberg introduced Kehrer, telling the employees that he had had business relations with Kehrer in other plants of the company and had invited him to make the address. Kehrer spoke about the advantage of union membership and urged the employees to join. His remarks, however, were not coercive. He also told the employees that under the law of South Carolina they had the right to abstain from joining the union but that he did not think the company would discharge anyone for joining the union.
 
 
 5
 At the close of the speech union organizers distributed union cards, and a box labeled 'Union Cards' with a supply of applications for membership was placed near the time clock in the plant. This box was subsequently removed by unidentified persons and the union never received any of the cards which might have been deposited in it. At the close of the meeting the employees were dismissed but were tole by the manager that they would be paid for the time spent at the meeting and also for the remainder of the day if they returned to their machines and finished out the working day.
 
 
 6
 On the same day, shortly after Kehrer's address, Pearl Wyatt, who had been absent from work for three weeks on account of illness, telephoned the plant manager and said she wanted to campaign against the union. He told her to report for work the next day if she wished to do so. She testified that the previous autumn the production manager, anticipating an effort to organize the plant, requested her to mobilize the employees against the union. When she returned to work the next day she requested permission to campaign against the union during working hours in the plant but the plant manager refused this permission on the ground that working hours were for work and not for conversation. She made no request to be permitted to address a meeting of the employees to be called to hear anti-union arguments. On several occasions the plant manager told the employees that they could make up their minds to join or not to join the union but that their talk for and against the union was holding up production and that they should concentrate on their work and stop wasting time.
 
 
 7
 On January 30, Pearl Wyatt filed with the Board the charges now under consideration, which were formulated by the General Counsel of the Board and served upon hte company and the union. Mrs. Wyatt had been in constant touch with the company's lawyer about her antiunion sentiment and activities and was assisted in the preparation of the charges by a lawyer recommended to her by the company's lawyer.
 
 
 8
 On the same day, which was the first payday after the meeting in the cafeteria, the company attached to each paycheck the following notice:
 
 
 9
 'your employer wishes to repeat that it will not discharge or otherwise interfere with any person who engages in union or anti-union activity so long as such activity does not affect that person's work or our production schedule.
 
 
 10
 'Joining or staying out of a union is your own free choice. Membership or non-membership in any union will not affect your standing with this Company.'
 
 
 11
 During the next few days both union and anti-union literature was distributed among the employees and the union organizer continued active efforts to secure union members. One day the plant manager and the union organizer were seen together at lunch in the company's cafeteria.
 
 
 12
 Finally, on or about February 18, 1959, Kehrer told Hochberg that the union had gotten a majority of the employees and it was agreed to permit the union to demonstrate its status by means of a card check to be conducted in the presence of a representative of the Labor Department of South Carolina. The card check was held as agreed and the representative of the Department certified that the union had achieved a majority of the employees. Kehrer and Hochberg then met and orally agreed upon a collective bargaining contract similar in terms to the union contracts at other plants of the company. This agreement was approved at a meeting of the union members in the following month, and the union has since operated as the bargaining representative of the employees.
 
 
 13
 This recital of facts, as to which there is no substantial dispute, does not in our opinion justify the reversal of the Board's decision since there was substantial evidence considered as a whole to support its findings. In such a case the findings are conclusive under 10(c), 29 U.S.C.A. 160(c). The speech of the union representative to the employees was admittedly not coercive and the subsequent actions of the union, according to the evidence, did not have this quality. Permission to make the speech on one occasion was not inconsistent with refusal to allow Pearl Wyatt to campaign against the union during working hours, since agitation for and against the union in the factory day after day for a considerable period would certainly have impeded production. There is no direct evidence that the actions of the representatives of the employer were of such character as to interfere with or restrain the employees in the exercise of their free choice. Viewed in the light most favorable to the petitioners, the actions of the supervisory representatives of the corporation amounted to no more than the expression of a preference for the union with which they have previously bargained in other plants. It has frequently been held, however, that such an indication of choice on the part of the employer does not of itself constitute unfair labor practices. It was early held that the Act does not enjoin an employer from expressing his view on labor policies or problems but leaves him free to take any side he may choose provided he does not coerce or restrain or interfere with the selection of a bargaining representative by the employees. N.L.R.B. v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348. The statute now expressly provides in 8(c) that the expressing of any views, argument or opinion shall not constitute or be evidence of an unfair labor practice under tha Act if such expression contains no threat of reprisal or force or promise of benefit. In this case the actions of the corporation, which in the view of the petitioners indicate partiality to the union, are surely offset by the admonitions of the company's representatives, orally and in writing, that the employees were free to do as they wished. Since a majority of the employees chose the union there is solid ground for the finding of the Board that the choice represented the unfettered expression of their free will after considering both sider of the argument.
 
 
 14
 The petitioners stress particularly the circumstances that the employer gave permission to the union to address the employees during working hours, for which the employees were paid, and that the employer accepted the card check without a formal election as evidence of the majority choice of the union and speedily negotiated a union contract. These are of course circumstances to be taken into account in making an ultimate finding but they are not conclusive, for it has been frequently held that they do not constitute per se violations of the statute in the absence of coercion, interference or restraint. See L. Greif & Bro. v. N.L.R.B., 4 Cir., 108 F.2d 551, 557-558; Wayside Press, Inc. v. N.L.R.B., 9 Cir., 206 F.2d 862; Coppus Engineering Corp. v. N.L.R.B., 1 Cir., 240 F.2d 564, 566, 572; N.L.R.B. v. Indianapolis Newspaper, Inc., 7 Cir., 210 F.2d 501; Chicago Rawhide Mfg. Co. v. N.L.R.B., 7 Cir., 221 F.2d 165, 170; Stewart-Warner Corp. v. N.L.R.B., 4 Cir., 194 F.2d 207, 210; District 50 United Mine Workers of America v. N.L.R.B., 4 Cir., 234 F.2d 565, 569-570. The facts of the pending case fall well within the scope of these decisions.
 
 
 15
 The petitioners place some reliance on testimony that several employees were discharged during the organization campaign for activity on behalf of the union and that no proceeding before the Board looking toward their reinstatement was instituted by the union. It is suggested that this circumstance is indicative of an understanding between the employer and the union which went beyond ordinary cooperation. This argument hardly seems consistent with petitioners' contention that the company manifested strong partiality for the union in giving it an opportunity to address the employees in the plant. In any event, the circumstance is of little significance in this case. There is evidence that the representative of the union brought the matter to the attention of the employer and insisted that the discharged employees be reinstated and secured a promise that the cases would be investigated. The record does not show what action was finally taken. The union's decision to deal directly with the employer about the discharges rather than formally to file charges was certainly a reasonable way in which to handle the matter and it does not support petitioners' allegation of an understanding going beyond cooperation.
 
 
 16
 The petition for review will be dismissed.
 
 
 17
 Petition dismissed.