564 F.2d 434
 95 L.R.R.M. (BNA) 2821, 183 U.S.App.D.C. 413,
81 Lab.Cas. P 13,287
 MIDWEST REGIONAL JOINT BOARD, AMALGAMATED CLOTHING WORKERS
OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
AMF Head Division of AMF, Inc., Intervenor.
AMF HEAD DIVISION OF AMF, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Midwest Regional Joint Board, Intervenor.
 Nos. 76-1067 and 76-1198.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 31, 1977.
Decided June 24, 1977.
 
 Vivian I. Schorman, New York City, for petitioner in No. 76-1067. Arthur M. Goldberg, Washington, D.C., was on the brief for petitioner in No. 76-1067.
 William H. Emer, Los Angeles, Cal., for petitioner in No. 76-1198 and intervenor in No. 76-1067.
 Jay E. Shanklin, Atty., N.L.R.B., Washington, D.C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.
 Before TAMM and MacKINNON, Circuit Judges, and OLIVER GASCH,* U. S. District Judge for the District of Columbia.
 Opinion for the Court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 This case arises from an order[1] of the National Labor Relations Board (Board) affirming the decision[2] of an Administrative Law Judge (ALJ) that the AMF Head Division of AMF, Inc. (hereinafter "the Company") violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1970)[3] by discharging two employees because of their union activities and sympathies; threatening employees with reprisals because of their union activities; conducting a poll of employees designed to obtain knowledge of their union propensities and interest; enforcing a no-solicitation rule in a discriminatory manner; and eliminating certain employee benefits. The Company seeks review of these findings and the Board cross-appeals seeking enforcement of its order. The ALJ also held that the Company's termination of normal posting procedures for jobs at its warehouse was not a violation of section 8(a)(1) and in a separately filed appeal the Midwest Regional Joint Board, Amalgamated Clothing Workers of America, AFL-CIO (hereinafter "the Union") challenges the Board's order to the extent that it affirms that holding. We ordered these appeals consolidated for consideration on the merits.
 
 
 2
 The appropriate standard of review in this case is clear. We are to sustain the Board's determinations if they are supported by substantial evidence on the record considered as a whole. NLRB v. Brown, 380 U.S 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our function is not to overturn the Board's choice between two equally plausible inferences from the facts if the choice is reasonable, even though we might reach a contrary result if deciding the case de novo. NLRB v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); Mueller Brass Co. v NLRB, 544 F.2d 815, 817 (5th Cir. 1977). However, even though our scope of review is thus limited, we should deny enforcement if, after a full review of the record, we are unable conscientiously to conclude that the evidence supporting the Board's determination is substantial. Universal Camera Corp. v. NLRB, supra ; Mueller Brass Co. v. NLRB, supra.
 
 
 3
 We find that there is substantial evidence to support the Board's determinations that the Company violated section 8(a)(1) of the Act by interrogating employees about their union activities, polling employees to determine their union sympathies, threatening an employee with reprisals because of union activities, discriminatorily enforcing a no-solicitation rule, and eliminating or curtailing employee benefits because of union activity. We also find that substantial evidence on the whole record supports the Board's finding that the Company's discharge of Barbara Vachon violated sections 8(a) (1) and (3), but we cannot find such support for the Board's finding that the discharge of Richard Mahoney contravened the Act. Therefore we deny enforcement of the Board's order insofar as it found a violation in Mahoney's termination. Finally, we find that the Board's finding that the Company did not violate section 8(a)(1) by the manner in which it re-staffed its Broomfield warehouse is supported by substantial evidence in the whole record. We therefore grant enforcement of the Board's order in all respects except the finding of a violation in Mahoney's discharge.
 
 
 4
 In early 1974, the Union began an organizational campaign among the employees at the Company plant in Boulder, Colorado, and the warehouse facility in Broomfield, Colorado. The Company designated William Tabar, director of operations at the Company's Boulder facility, to direct its response to the Union's campaign. On July 24, 1974, the Union and the Company entered into a stipulation agreement pursuant to which a secret ballot representation election was held on August 16, 1974.
 
 I. SECTION 8(a)(3) CHARGES
 A. Mahoney's Termination
 
 5
 Richard Mahoney worked for the Company from April, 1974, until his termination in July of 1974. Mahoney signed a union authorization card but that was the extent of his union activity. He was not a member of the organizing committee and he did not distribute Union literature. Mahoney began work as a janitor but later became an extruder machine operator.[4] Before Mahoney actually used the extruder his department supervisor, Thomas Stevenson, fully instructed him on the operation of the machine. Stevenson emphasized that, if the machine were ever to jam or malfunction, the safety regulations required the operator to shut off all power immediately and contact his supervisor.[5] After receiving Stevenson's instructions Mahoney began using his machine.
 
 
 6
 Later that same day Stevenson observed Mahoney using his fingers to press material down the throat of his extruder. Stevenson cautioned him against this practice, pointing out that he could very easily get his fingers caught. In June, Stevenson again observed Mahoney placing epoxy into the throat of the machine with his fingers. Again Stevenson warned Mahoney in emphatic terms not to follow this procedure, stressing that the tamping stick was there for a purpose and should be used accordingly. Subsequently, on July 9, 1974, Stevenson observed Mahoney with his safety glasses off and stuffing material down into the extruder by hand. Stevenson informed Mahoney that if he didn't remove his fingers from the machine he would lose both his fingers and his job.
 
 
 7
 A short while later (approximately thirty minutes), Nancy Platt, an engineering technician at the Company, presented Mahoney with a special mix of material to extrude. Mahoney placed the material in the machine and tamped it down. The material failed to extrude and, when additional material was added, the machine jammed. After failing to re-start the machine with the tamping stick, Mahoney reached into the throat of the machine in an effort to extract the material. He removed two small handfulls of material, but on the third attempt the machine released and sliced off the end of one of his fingers. Mahoney then shut off the machine and went to the infirmary for first aid.
 
 
 8
 Upon investigation of the incident Stevenson recommended to William Tabar, director of operations for the Company, that Mahoney be suspended. Tabar, without discussing his decision with any other management personnel, ordered Mahoney's termination. Tabar deemed termination to be warranted by Mahoney's insubordination and gross violation of safety regulations.[6]
 
 
 9
 During the summer of 1974, subsequent to Mahoney's termination, a Workman's Compensation hearing resulted in an award reduced by half the amount normally given due to the finding that Mahoney had violated a safety regulation. On October 11, 1974, Mahoney was in the Company parking lot and encountered the manager of safety and security for the Company. Mahoney shouted at the manager, "If this place goes up in flames, you will know who did it."[7]
 
 
 10
 The ALJ concluded that, although grounds for disciplining Mahoney were present, the Company chose the most severe form of personnel action for strategical reasons. It is important to note that in controversies involving employee discharges or suspensions the motive of the employer is the controlling factor. NLRB v. Brown, supra, 380 U.S. at 287, 85 S.Ct. 980; Mueller Brass Co. v. NLRB, supra, 544 F.2d at 819. Absent a showing of anti-union motivation, an employer may discharge an employee for a good reason, a bad reason, or no reason at all without running afoul of the labor laws. NLRB v. O. A. Fuller Super Markets, Inc., 374 F.2d 197, 200 (5th Cir. 1967). In addition the mere fact that a specific employee not only breaks a company rule but also evinces a pro-union sentiment alone is not sufficient to vitiate the just cause for his discharge. Mueller Brass Co. v. NLRB, supra, 544 F.2d at 819. When good cause for discharge or suspension is clearly established, the burden is on the Board to show that anti-union animus was the motivating factor. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); D'Youville Manor, Lowell Mass., Inc. v. NLRB, 526 F.2d 3, 6 (1st Cir. 1975); NLRB v. Billen Shoe Co., 397 F.2d 801, 803 (1st Cir. 1968). The burden on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose an illegal one. NLRB v. Billen Shoe Co., supra, 397 F.2d at 803. The mere existence of anti-union animus is not enough. Chauffeurs Local 633 v. NLRB, 166 U.S.App.D.C. 157, 509 F.2d 490, 498 (1974). In order to establish a section 8(a)(3) violation the Board must find that the employee would not have been discharged but for his union activity. NLRB v. Klaue, 523 F.2d 410, 413 (9th Cir. 1975); Ridgely Manufacturing Co. v. NLRB, 166 U.S.App.D.C. 232, 510 F.2d 185, 186 (1975).
 
 
 11
 The ALJ and the Board found that there was adequate cause to discipline Mahoney but held that the discipline imposed was too harsh. The decision of what type of disciplinary action to impose is fundamentally a management function. Unless the Board can show by affirmative and persuasive evidence that an improper motive was the reason for the harshness of the discipline, the management's decision must stand. NLRB v. Billen Shoe Co.,supra, 397 F.2d at 803. The Board cites the fact that Mahoney was a pro-Union man and that Tabar was aware of this[8] as evidence supportive of a section 8(a)(3) violation. However, when the gross safety violations and insubordination of Mahoney are measured against this evidence of illegal motivation we cannot find that the Board has met its burden with respect to this charge.[9] The grounds for discipline[10] clearly outweigh any showing of anti-union animus and thus the Board has not met the "but for" test of NLRB v. Klaue, supra.[11]
 
 
 12
 The Board also points to the conversation James Hanafin, the director of employee relations, had with an employee regarding Mahoney's discharge as evidence that anti-union animus was the motivating factor of Mahoney's discharge. A close examination of this evidence reveals that it is unreliable at best and simply not enough to show that anti-union animus was the reason for Mahoney's discharge. Hanafin was terminated from the Company in April of 1975, for improprieties relating to the financial situation of the Company. App. 282. Hanafin was very bitter about the termination and requested that he be allowed to remain at the Company until the end of the week. His request was granted and on his last day he visited one of the employees. Allegedly she asked him why Mahoney had been fired and he replied that it was all part of the game to break union morale. App. 236. Surely such a statement from an embittered ex-employee cannot support a finding that the Company was illegally motivated in firing Mahoney when there is ample evidence of good cause for the discipline. The finding of the Board that the Company had an illegal motive in firing Mahoney is not supported by substantial evidence and therefore its order to that effect cannot be enforced.
 
 B. Vachon's Termination
 
 13
 Barbara Vachon worked for the Company from March, 1973, until her termination in August, 1974. Vachon was a very active Union supporter. She was a member of the Union Organizing Committee and her name appeared in Union leaflets.
 
 
 14
 During June, 1974, Vachon requested two weeks medical leave to undergo surgery. Andrew Cobb, Vachon's supervisor, authorized three weeks medical leave, beginning July 8, to cover any contingencies. Cobb also informed Vachon that she would have to present a medical release to him in order to return to work. Vachon was hospitalized for two weeks, and upon her release from the hospital on July 22, she was advised by her physician not to return to work for two more weeks. He also told Vachon that it was medically permissible for her to travel to New Hampshire to visit her family.
 
 
 15
 Vachon informed her lead person[12] at the plant, Faye Fullen, of her physician's orders and of her trip. Fullen transmitted Vachon's message to Cobb, informing him that Vachon would be back to work on August 5. Vachon returned from New Hampshire on Sunday, August 4. On Monday, August 5, she called her physician to obtain her medical release but he was not in. On Tuesday, Auguest 6, Vachon discovered that her physician was on vacation and that she would not be able to get a release until Friday, August 9. Tuesday afternoon Fullen informed Cobb of Vachon's predicament concerning her medical release.
 
 
 16
 In the meantime Cobb had notified Tabar that Vachon's medical leave had expired on Monday, July 29, and that she had not yet returned to work. Tabar adopted a "wait and see" approach. On August 7, Cobb recommended that Vachon be suspended for failure to communicate with her supervisor during an absence of three days and for overstaying her medical leave. According to Cobb, Vachon's medical leave had expired on July 29 and she had sent word to him that she would return on August 5. However, rather than return on the 5th, she sent another message that she would be in on the 7th. As of the 7th Cobb said he had not heard from her.
 
 
 17
 On August 8, the Company sent a telegram to Vachon with notification of her suspension and instructing her to report to the personnel office that afternoon. At the afternoon meeting the Company representatives confronted Vachon with the charges that she had not followed company policy in renewing her medical leave and had been absent for three days without notifying her supervisor. Vachon's reply was that she "did not have the money to go walking and calling up people" and that she had transmitted notice of her absence through her lead person. After the meeting, the Company decided to terminate Vachon and gave for its reason the above-mentioned infractions of company policy.
 
 
 18
 The regulation relating to medical leave was in the Company's handbook. The three day absence-automatic termination provision was published only in a policy memo distributed to supervisors, but at least twenty-four employees had been terminated under this policy in the past. In practice, however, employees had frequently relayed messages regarding tardiness and absence to supervisors through lead persons and other personnel. On several occasions Fullen had relayed messages to Cobb from employees concerning these matters and Cobb had accepted the information without comment.
 
 
 19
 As in the Mahoney discharge, the Board found that although adequate grounds for disciplining Vachon existed, the Company chose the harshest measure of discipline for strategical, anti-union reasons. Here we find that the Board has met its burden of showing an affirmative and persuasive reason why the employer rejected the good cause and chose an illegal one and has established that but for Vachon's union activity she would not have been discharged.
 
 
 20
 The essence of discrimination in violation of section 8(a)(3) is treating like cases differently, Mueller Brass Co. v. NLRB, supra, 544 F.2d at 819, and the Company's discharge of Vachon is a classic example of treating like cases differently because of anti-union animus. Vachon was a very active Union supporter and organizer. Her pro-Union activities were highly visible to the Company. She was charged with violating two Company policies: 1) the medical leave extension procedure, and 2) the absent for three days, call-in procedure. The Company relied on the latter violation as the basis of the discharge. App. 30. Apparently, the Company realized that, having not acted upon her message notifying Cobb of the need for a week's extension of her medical leave, the medical leave violation was not grounds for discharge. Thus, the Company chose to rely on Vachon's violation of the "three day absence without notification of supervisor" rule and invoked its sanction of automatic termination. This is where the Company treated like cases differently. There is unrefuted testimony in the record that, although the handbook regulation required employees to call in to the plant receptionist if they were going to be absent or late, the actual practice was something else entirely. The accepted custom was for employees to relay messages regarding absence through lead personnel. These messages were deemed sufficient to satisfy the call-in requirement. App. 73, 99, 177, 191, 192. Vachon complied with the accepted custom by relaying messages through her lead person, Fullen, to the effect that she needed another week off and that she was having difficulty obtaining her medical release. The Company gave no reason why Vachon's messages did not satisfy the call-in requirement whereas similar messages from other employees were sufficient in the past.
 
 
 21
 We find that the extenuating circumstances of Vachon's case coupled with the fact that she was a most ardent Union supporter provide substantial evidence for the Board's finding that the Company's choice of the harshest sanction constituted a violation of section 8(a)(3).II. SECTION 8(a)(1) CHARGES
 
 
 22
 The purpose of section 8(a)(1) is to ensure an employee free choice in the decision whether to accept union representation, a free choice explicitly preserved by section 7 of the Act.[13] Chauffeurs Local 633 v. NLRB, supra, 509 F.2d at 493. Since the inception of the Act, the Board has recognized that interrogation by an employer of a worker's attitude toward the union and statements by the employer about the consequences of union representation have a tendency to coerce workers in the exercise of their section 7 rights. Id.; see NLRB v. Virginia Electric Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941).
 
 A. Hanafin's Conversations
 
 23
 In April, the day after a Union representative had visited Mahoney's apartment and Mahoney had executed an authorization card, Hanafin informed Mahoney that he had heard that Mahoney had some visitors the previous evening. Mahoney indicated to Hanafin that that information was correct, and Hanafin inquired if Mahoney knew how the Union representative had obtained his address. Mahoney replied that he did not. Hanafin then asked if Mahoney had signed a union card. After reflecting for a moment, Mahoney stated that he had done so, but added that he was still not sure if he would support the Union in the election.
 
 
 24
 Hanafin also spoke with Albert Klose, Mahoney's roommate and essentially duplicated the comments and questions he had posed to Mahoney. He did not inquire, however, whether Klose had signed a union authorization card.
 
 
 25
 During the course of her employment with the Company, Lois Dahlstrom was suspended for alleged excessive absenteeism. Towards the end of July, 1974, she went to Hanafin's office to protest her suspension. In speaking with Hanafin, Dahlstrom asserted that her suspension had been unfair and specified the rationale supporting her contentions. In response, Hanafin blurted, "If you think things are tough now, sweetheart, wait till you get a union in here." App. 8.
 
 
 26
 The courts and the Board have developed specific criteria for determining whether employer questioning and predictions as to the consequences of unionization pass beyond permissible persuasion into impermissible use of employer economic power. As summarized in Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964) these criteria include:
 
 
 27
 1. The background, i. e. is there a history of employer hostility and discrimination;
 
 
 28
 2. The nature of the information sought . . . ;
 
 
 29
 3. The identity of the questioner, i. e. how high is he in the company hierarchy;
 
 
 30
 4. The place and method of interrogation;
 
 
 31
 5. The truthfulness of the reply.
 
 
 32
 Applying the criteria of Bourne to the present case we find that there is substantial evidence in the record to support the Board's conclusion that Hanafin's conversations with Mahoney and Klose constituted a violation of section 8(a)(1). The statements were made in the course of a heated organizational campaign. The information was sought for the purpose, among others, of guiding Hanafin's strategy to defeat the Union's organizational efforts. Hanafin was a member of the management hierarchy and Mahoney hedged in his reply concerning the authorization card, indicating a fear of Hanafin's reaction. Moreover, Hanafin did not explain the purpose of his questions to the employees and he did not offer any assurances against reprisals. See Chauffeurs Local 633, 219 N.L.R.B. No. 39 (1975), on remand from 166 U.S.App.D.C. 157, 509 F.2d 490 (1974). In these circumstances we must accept the Board's conclusion that Hanafin's questioning of Mahoney and Klose interfered with their section 7 rights and thus violated section 8(a)(1).
 
 
 33
 The record evidence also supports the Board's finding of a section 8(a)(1) violation in Hanafin's threat to employee Dahlstrom that things would be tougher for the employees if the union won the election. NLRB v. Gissel Packing Co., 395 U.S. 575, 616-20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), established that such statements must be non-coercive or a carefully phrased prediction, based on objective facts beyond the employer's control, which only convey an employer's belief as to the demonstrably probable consequences of unionization. The record indicates that Hanafin threatened Dahlstrom in his office when she was there to complain about her suspension. A threat to impose harsher discipline if the employees succeed in bringing in the union is clearly meant to be coercive and thus violates section 8(a)(1). See Helena Laboratories Corp., 225 N.L.R.B. No. 36, 93 L.R.R.M. 1418 (1976); Teamsters Local 891, 224 N.L.R.B. No. 215, 93 L.R.R.M. 1425 (1976).
 
 B. The Poll
 
 34
 In July 1974, prior to the consent election agreement, the president of the Company wanted the employees to vote on whether they wished to have temporary employees participate in the Board representation election. This issue had commanded the attention of both the Company and the Union and had been the subject of an article given prominence in a publication circulated to all employees by the Union. The article clearly delineated the positions of the parties the Union favored the inclusion of employees arguably temporary in status while the Company favored their exclusion. For the actual polling the employees assembled according to departments and were instructed to register their preference by writing "yes" or "no" on a blank piece of paper. The employees in each department did so and the ballots were returned to their departmental supervisor who counted the ballots and recorded the results. The tabulations, revealing the numerical results of the balloting by department, were then made available to Tabar and Hanafin.
 
 
 35
 Since interrogation by polling offers the opportunity for unlawful abuse of employee rights, the polling of employees by management is an area that continues to be closely circumscribed by the courts. See NLRB v. Harry F. Berggren and Sons, Inc., 406 F.2d 239, 244 (8th Cir.), cert. denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 74 (1969). In Strukness Construction Co., 165 N.L.R.B. No. 102, 65 L.R.R.M. 1385, 1386 (1967), the Board set forth criteria by which to evaluate employee polls. In turn the courts have held that, if employees' rights are not to be subject to derogation by the right of management to poll employees for a legitimate purpose, the safeguards of Strukness should be observed. NLRB v. Harry F. Berggren and Sons, supra, 406 F.2d at 245. Under those safeguards and absent unusual circumstances polling of employees violates section 8(a)(1) unless
 
 
 36
 1) The purpose of the poll is to determine the truth of the union's claim to majority;
 
 
 37
 2) This purpose is communicated to the employees;
 
 
 38
 3) Assurances against reprisals are given;
 
 
 39
 4) The employees are polled by secret ballot;
 
 
 40
 5) The employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere.
 
 
 41
 165 N.L.R.B. at 1063.
 
 
 42
 In the case at bar the Board found that the poll was structured in a manner designed to reveal the union sympathies of the employees. Applying the Strukness criteria we find that there is substantial evidence in the record to support the Board's finding. The purpose of the poll was not to determine the truthfulness of the Union's claim of majority. The Company did not give any assurance against reprisal for refusing to vote or for voting against the Company's position.[14] The poll was conducted on a departmental basis and separate departmental tallies were made. This method may not have been purposely chosen to disclose individual voting preferences, but no precautions were taken to guarantee secrecy even though some departments consisted of a very small number of employees.[15] By departmentalizing the voting, the Company could best gauge areas of Company strength and identify enclaves of Union support. Thus the Board found that the poll placed employees in jeopardy of unwittingly or unwillingly disclosing their Union sympathy. We find that, given these circumstances, the Board's conclusion that the poll was a violation of section 8(a)(1) was correct.
 
 
 43
 C. Elimination and Curtailing of Employee Benefits
 
 
 44
 The elimination of employee benefits or privileges may constitute illegal interference if the employer's motive is to discourage union organization. International Union of Electrical Workers v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, 1247 cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); NLRB v. Garland Knitting Mills of Georgia, Inc.,408 F.2d 672, 673 (5th Cir. 1969). On August 16, 1974, a representation election was held among the employees of the Company and they voted in favor of representation by the Union. Challenged ballots were determinative of the outcome, and as a result, during the immediate post-election period the employees were led to believe that the election would be set aside and a new election held. In this context the Company's elimination or curtailment of employee benefits would convey a very clear message to the employees that they were being punished for voting for the Union and warned of the consequences of supporting the Union if a new election were required.
 
 
 45
 At relevant times prior to the election employees were permitted to use the Company's WATS[16] line on Saturdays. There was significant demand for and use of this service. Immediately following the election, however, employees who endeavored to gain access to the WATS line were informed by the plant guard that the line was no longer available to them. The Company's defense before the Board was that an employee committee had eliminated the WATS line service.[17] This claim was directly refuted by the testimony of a member of that committee that the elimination of the WATS line was never discussed by the committee before it disbanded prior to the election. App. 243-48.
 
 
 46
 There was also testimony that during the two previous ski seasons the Company had a program of lending skis to its employees. However, following the election, the employees were informed that skis would not be available for loan. The Company contended that the ski loaning program was curtailed because ski sales had depleted the stock of low quality skis used in the program. However, there was also testimony which indicated that the ski loaning program was in effect in the past two years notwithstanding similar ski sales to employees. The Company also relied on the testimony of Tabar that he had seen documents indicating four employees had been loaned skis following the election to suggest that the program was not eliminated, but the Company did not introduce into evidence the documents which Tabar claimed to have seen. In such circumstances it is appropriate to infer, as the Board did, that the documents, which were solely in the Company's possession, would not have supported Tabar's contention. See UAW v. NLRB, 148 U.S.App.D.C. 305, 459 F.2d 1329, 1335-37 (1972).
 
 
 47
 Prior to the election all available hourly jobs, including both rank-and-file and lead positions, were posted on bulletin boards so that employees could bid on them. There was testimony in the record that a week after the election a supervisor informed employees that all job posting would cease until further notice. Except for a few lead positions, the job postings did cease for about two and one-half months. The Company defended this action by asserting that the change in job posting was due to the seasonal nature of the business. There was undisputed testimony on the record, however, which indicated that there were jobs filled during this time without being posted.
 
 
 48
 We conclude that there is substantial evidence in the record to support the Board's finding that the Company's elimination of the WATS line privilege and ski loaner program and the curtailment of the job posting procedures constituted a violation of section 8(a)(1). The Company's proffered business justifications were directly refuted by uncontradicted evidence or were insufficient to overcome the proper inferences drawn by the Board that the Company's motive in eliminating these benefits was to interfere with employee rights.
 
 D. The No-Solicitation Rule
 
 49
 The Company maintained a no-solicitation rule.[18] During the organizational campaign, literature made available by the Company's personnel department was placed on the desks of supervisors and employees were made aware of its availability. Lead personnel distributed this literature in certain departments during working hours. Pro-Company literature was also distributed at points inside the plant gate leading to Company property. Similarly, prior to the national election of 1974, political candidates and their non-employee supporters were permitted to distribute literature and meet with employees inside the plant gate. On several occasions, however, employees who attempted to pass out pro-Union literature at points inside the plant gate were instructed by the guard to move to a point several feet outside the gate. One employee was reprimanded for distributing Union literature during working hours.
 
 
 50
 The Board concluded that the Company's disparate enforcement of the no-solicitation rule violated section 8(a)(1). We find substantial evidence in the record to support this conclusion. The Company countenanced the distribution of pro-Company literature by lead personnel in the plant during working hours, while strictly enforcing the rule with respect to the distribution of pro-Union literature. The Company also bent the rule as it pertained to the distribution of material on Company property to accommodate individuals other than Union advocates, but strictly enforced the situs aspect of the rule with respect to Union advocates. Such disparate enforcement of a no-solicitation rule is a clear violation of section 8(a)(1). See Mission Valley Mills, 225 N.L.R.B. No. 59, 93 L.R.R.M. 1227, 1229 (1976).
 
 E. Re-staffing of Warehouse
 
 51
 In early August the Company suffered a substantial financial loss due to thefts at its Broomfield warehouse. Thereafter, the employment complement at the warehouse was replaced. The jobs were not filled under any bid procedure but through individual selection. Plant employees known to have opposed the Union were included in the small complement of employees chosen to staff the warehouse facility.
 
 
 52
 The Board concluded that the Company's failure to use the posting procedure in re-staffing the Broomfield warehouse was justified by legitimate security concerns and did not violate the Act. That conclusion is supported by substantial evidence in the record. Undisputed evidence established that in the latter part of August, 1974, the Company discovered a series of thefts of equipment from the warehouse amounting to losses of tens of thousands of dollars. App. 10, 107. Employees at the plant and the warehouse were among those implicated in the thefts. Due to this costly security breach the Company decided to completely re-staff the warehouse and suspended the normal job posting for the warehouse until the security re-staffing was completed. The fact that the discovery of the thefts coincided with the representation election is not enough to show an improper motive on the part of the Company. The finding that legitimate business reasons motivated the Company's action is supported by substantial evidence and entitled to enforcement.
 
 CONCLUSION
 
 53
 Since we find the Board's findings as to Vachon's discharge and the various 8(a)(1) charges, i. e. Hanafin's conversations with employees Mahoney, Klose, and Dahlstrom, the poll, the elimination of employee benefits, the disparate enforcement of the no-solicitation rule, and the re-staffing of the warehouse, are supported by substantial evidence we grant enforcement of its order insofar as these findings are concerned. Since we find that the order as it pertains to Mahoney's discharge is not supported by substantial evidence, however, we deny enforcement as to that part.
 
 
 54
 Enforcement granted in part and denied in part.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 222 N.L.R.B. No. 21 (1976)
 
 
 [2]
 App. 4-34
 
 
 [3]
 29 U.S.C. § 158 (1970) provides:
 (a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organizations . . . .
 29 U.S.C. § 157 (1970) guarantees employees the right to form, join, or assist labor organizations, to bargain collectively, to engage in other concerted activities for their mutual aid or protection, or to refrain from any or all such activities. Section 8(a)(1) makes it an unfair labor practice to restrain or coerce employees in the exercise of their protected section 7 rights. The unfair labor practice defined in section 8(a)(3) encompasses discrimination having as a purpose the encouragement or discouragement of membership in a union. Invariably where a violation of section 8(a)(3) is charged, the employer's action in changing his employee's tenure or condition of employment is not disputed. What is in contention is whether the employer intended to encourage or discourage membership in a union. C. Morris, The Developing Labor Law 65, 66, 115 (1971).
 
 
 [4]
 The extruder machine has the characteristics of a large meat grinder and is used in the fashioning of tennis racquets. It is powered by a small motor which activates a rotating shaft enabling the machine to receive material placed in the throat-like opening at its top. Material processed through the machine is extruded in rope-like fashion through a cone-shaped opening at the other end. In actual operation, the operator places core material into the opening at the top and forces the material down into the machine by use of a long-handled tamping device about twelve inches long
 
 
 [5]
 The safety regulations also provided that safety glasses were to be worn by all production employees at all times. A copy of the safety regulations was presented to each employee upon his hiring and was also distributed in a pay envelope
 
 
 [6]
 The disciplinary procedures of the Company regarding safety violations were: for the first offense, verbal warning; second offense, written warning; third offense, suspension; and fourth, hearing, pending termination. There were no procedural guidelines to be followed in the case of insubordination terminations
 
 
 [7]
 Mahoney was arrested and plead guilty to one count of harassment while a disorderly conduct charge was dropped. In May, 1975, the count of harassment was dismissed and all records except the record of arrest have been expunged
 
 
 [8]
 Although Tabar denied any knowledge of Mahoney's "union activity", the ALJ imputed the knowledge of Hanafin to Tabar since both were working closely together on management's campaign. We are well aware of the principle that an employer's knowledge of an employee's union activity may be inferred from circumstantial evidence. See Chauffeurs Local 633 v. NLRB, supra, 509 F.2d at 497; Texas Aluminum Co. v. NLRB, 435 F.2d 917, 919 (5th Cir. 1970)
 
 
 [9]
 Mahoney's only "union activity" was the placing of his signature on a union authorization card. The Fifth Circuit has recently held that the mere fact that an employee had signed a union card did not constitute "union activity" sufficient to protect him from being disciplined for insubordination. Florida Steel Corp. v. NLRB, 529 F.2d 1225, 1234 (5th Cir. 1976). Similarly the mere signing of a union card by Mahoney did not insulate him from discipline for his safety regulation violations and insubordination. Section 7 of the Act was intended to provide a shield against employer retaliation; it was not meant to act as a sword which employees could rely on to violate their employer's rules with impunity. Id. In recent cases, the Board has not allowed employees, even though they were leading union adherents and known to be such by their employers, to invoke the protections afforded by sections 7 and 8(a)(3) when the employer had valid cause to discipline the employees. See Questor Corp., 225 N.L.R.B. No. 133, 93 L.R.R.M. 1017 (1976); Scientific Pest Control Corp., 224 N.L.R.B. No. 212, 93 L.R.R.M. 1265, 1266 (1976); Concrete Technology, Inc., 224 N.L.R.B. No. 142, 93 L.R.R.M. 1282 (1976); GTE Lenhart, Inc., 215 N.L.R.B. No. 46, 88 L.R.R.M. 1425 (1975)
 
 
 [10]
 They consisted of gross safety violations and repeated defiance of a supervisor's explicit instructions
 
 
 [11]
 Whether or not Mahoney had signed a union card made no difference in the decision to discipline him. The question of union activity what little existed did not influence the decision to terminate Mahoney
 
 
 [12]
 Lead persons act as assistants to the supervisors and are in charge if the supervisor is not present. App. 73
 
 
 [13]
 29 U.S.C. § 157 (1970)
 
 
 [14]
 Courts have found this factor alone to be sufficient to support a finding of a violation. See NLRB v. Super Toys, Inc., 458 F.2d 180, 183 (9th Cir. 1972)
 
 
 [15]
 The employees voted in the open in their work area in the presence of supervisors, Union committee members and fellow employees
 
 
 [16]
 Wide Area Telecommunication Service
 
 
 [17]
 An employee committee was entrusted with oversight authority over the WATS program. If the consensus of the employees indicated a desire to end the program the Committee was empowered to do so
 
 
 [18]
 The Company's no-solicitation rule reads:
 The posting of notices or other written material on Company property by employers and the circulation or distribution of written material in working areas or on working time is strictly prohibited. In addition, solicitation of any kind during working time is prohibited.
 In a footnote to the Board's order members Fanning and Jenkins disavowed the implication of the ALJ that a no-solicitation rule prohibiting distribution of written materials "in working areas or on work time" was necessarily a valid one. 222 N.L.R.B. No. 21 at 161 n.1 (1976).