**PERDUE FARMS, INC., COOKIN' GOOD DIVISION, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

No. 97–1335.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1998.

Decided May 29, 1998.

D. Christopher Lauderdale argued the cause for petitioner/cross-respondent. With him on the briefs was Erin E. Swann.

David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for respondent/cross-petitioner. With him on the brief was Linda Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Margaret A. Gaines, Supervisory Attorney, and Steven B. Goldstein, Attorney, entered appearances.

Before: SILBERMAN, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Opinion dissenting in part filed by Circuit Judge RANDOLPH.

TATEL, Circuit Judge:

After a union lost a representation election at a chicken processing plant, the National Labor Relations Board found that the company had committed unfair labor practices by interrogating employees about their union sympathies, as well as by increasing wages and implementing a new attendance policy in order to influence the election. The Board also approved the administrative law judge's

issuance of a preclusion order as a sanction for the employer's violation of a subpoena. Because substantial evidence in the record supports the Board's findings, and because the ALJ's preclusion order was not an abuse of discretion, we deny the company's petition for review and, with one exception, grant the Board's cross-application for enforcement.

## I

Two months after petitioner Perdue Farms, Inc. acquired a chicken processing plant in Dothan, Alabama, in January 1995, the Laborers' International Union of North America, AFL–CIO, Local 784 began an organizational campaign. In April, the Union filed a petition for a representation election. The election occurred on June 15. The Union lost by a substantial majority.

Objecting to the conduct of the election, the Union charged Perdue with violating sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1994). Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." *Id.* § 158(a)(1). Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

Following a seven-day hearing, the administrative law judge found that the employer had violated sections 8(a)(1) and (3) of the Act. Adopting the ALJ's findings, the Board agreed that Perdue violated section 8(a)(1) by interrogating employees about their union activities and sympathies, by confiscating union materials from employees entering the plant, by threatening to close the plant if the Union won the election, by promising increased benefits, by changing the plant attendance policy two days before the election, and by timing a wage increase and elimination of an attendance bonus program for the day before the election, all in order to influence the election's outcome. *Cooking Good Div. of Perdue Farms, Inc.*, 323 N.L.R.B. No. 50, at 3–5, 8–10, 1997 WL 156724 (Mar. 31, 1997). The Board also found that the timing of the wage increase and the changing of the attendance policy violated section

8(a)(3), *id.* at 9–10, a somewhat surprising conclusion in view of the fact that section 8(a)(3) has no applicability where, as here, the record contains no evidence of discrimination. Conceding this point, agency counsel advised us at oral argument that the Board no longer sought enforcement of the section 8(a)(3) portion of its order. The Board found that the interrogation of employees, the confiscation of union materials, the timing of the wage increase, and the changing of the attendance policy also constituted objectionable conduct affecting the election. It thus issued a cease-and-desist order, set aside the results of the election, and ordered a new one. *Id.* at 12.

Perdue now petitions for review of the Board's findings regarding the wage increase, the changed attendance policy, and the interrogation of employees. Perdue also challenges the ALJ's exclusion of certain evidence as a sanction for the company's violation of a subpoena. The Board cross-applies for enforcement.

## II

We begin with the company's challenge to the ALJ's exclusion of evidence. Prior to the hearing, the Board's General Counsel served Perdue's human resources manager, Jimmy Chappell, with a subpoena *duces tecum* requesting notes and other records "which reflect the content of meetings between Jimmy Chapel [sic] and employees conducted between May 1, 1995 and June 15, 1995." Although Perdue produced undated notes of meetings that it asserted occurred on or about May 11, it refused to produce any other documents relating to meetings occurring between May 1 and June 15. Perdue argued that the subpoena was "overly broad" because, although the subpoena sought documents for a six-week period, the original complaint alleged violations by Chappell only on or about May 11. Rejecting Perdue's argument and quoting the Federal Rules of Evidence's definition of "relevant evidence," the ALJ concluded that the company's view of relevance was overly narrow, noting that six unfair labor practice allegations named Chappell, that witnesses testified to meetings Chappell held from March

to late May, and that the notes could contain "admissions relating to other aspects of the case." *Cooking Good Div.,* 323 N.L.R.B. No. 50, at 5, 1997 WL 156724. Pointing out that Perdue claimed no privilege and neither asked for *in camera* review of the disputed notes nor offered any other reason for refusing to produce them, the ALJ barred the company from introducing virtually any evidence regarding Chappell's meetings, including the May 11 meetings for which Perdue had provided notes. *Id.*

Perdue challenges the ALJ's ruling on two accounts: It claims that documents relating to the June meetings were irrelevant; it also claims that having produced all requested documents regarding Chappell's May 11 meetings, it should have been allowed to present testimony and documentary evidence about those meetings. Reviewing the ALJ's ruling for abuse of discretion, *Dayton Hudson Dep't Store Co. v. NLRB,* 79 F.3d 546, 552 (6th Cir.1996), we reject both arguments.

 Section 11(1) of the National Labor Relations Act, 29 U.S.C. § 161(1), authorizes subpoenas for evidence "that relates to any matter under investigation or in question." *Id.* Information sought in an administrative subpoena need only be "reasonably relevant." *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *see also NLRB v. Line,* 50 F.3d 311, 314 (5th Cir.1995) (applying *Morton Salt*'s "reasonably relevant" standard to NLRB subpoenas). Citing *In re Sealed Case (Admin. Subpoena),* 42 F.3d 1412 (D.C.Cir.1994), where we quashed a subpoena seeking information about "other wrongdoing, as yet unknown," *id.* at 1419, Perdue argues that the request for documents regarding meetings in June lies beyond even the broadest notions of relevance. We disagree. Unlike the subpoena in *In re Sealed Case,* the subpoena here sought not information regarding "other wrongdoing, as yet unknown," but information relating to specific allegations of wrongdoing contained in the General Counsel's complaint. As the ALJ found, the subpoenaed material could have provided evidence regarding specific allegations not involving Chappell and/or events occurring from May 1 to the June 15 election. Under these circumstances, the ALJ's conclusion that the sub-poenaed material was relevant did not amount to an abuse of discretion.

 We reach the same conclusion with respect to the ALJ's preclusion order. "The preclusion rule," we have said, "prevents the party frustrating discovery from introducing evidence in support of his position on the factual issue respecting which discovery was sought." *Atlantic Richfield Co. v. U.S. Dep't of Energy,* 769 F.2d 771, 794 (D.C.Cir.1984). Pointing out that it had not "frustrat[ed] discovery" with respect to Chappell's May 11 meetings, Perdue argues that it should have been allowed to offer testimony about those meetings and to establish, contrary to the testimony of certain employees, that Chappell conducted no other meetings during the month. Once a party's challenge to a subpoena has been rejected, however, the party cannot "pick and choose which parts ... it will obey and which parts it can ignore." *UAW v. NLRB,* 459 F.2d 1329, 1342 (D.C.Cir.1972). A party refusing to comply with a subpoena risks application of the preclusion rule: "Without an adequate evidentiary sanction, a party served with a discovery order in the course of an administrative adjudicatory proceeding has no incentive to comply, and ofttimes has every incentive to refuse to comply." *Atlantic Richfield,* 769 F.2d at 795.

### III

 Turning to Perdue's substantive challenges, we will not set aside a Board decision unless, "reviewing the record as a whole, it appears that the Board's factual findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue." *Synergy Gas Corp. v. NLRB,* 19 F.3d 649, 651 (D.C.Cir. 1994). Our review of the Board's factual conclusions is "highly deferential." *LCF, Inc. v. NLRB,* 129 F.3d 1276, 1281 (D.C.Cir. 1997); *see also Synergy Gas Corp.,* 19 F.3d at 654 (Silberman, J., concurring) ("Our review, both in theory and in practice, is quite deferential."). "If there is substantial evidence to support the Board's conclusions, we will uphold the Board's decision even if we

would have reached a different result had we considered the question *de novo.*" *Id.* at 651.

### *Interrogation of Employees*

 Claiming that the Board erroneously applied the relevant legal standard, Perdue challenges the Board's determination that Chappell violated section 8(a)(1) by interrogating employees when he asked them if Union representatives had visited them at their homes. Interrogation of employees violates section 8(a)(1) if, under all the circumstances, it reasonably "tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Rossmore House,* 269 N.L.R.B. 1176, 1177, 1984 WL 36297 (1984). Both the Board and the courts agree that the starting point for determining whether unlawful interrogation has occurred is the five-factor test set forth in *Bourne v. NLRB,* 332 F.2d 47 (2d Cir.1964):

> (1) The background, i.e., is there a history of employer hostility and discrimination?
>
> (2) The nature of the information sought, e.g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
>
> (3) The identity of the questioner, i.e., how high was he in the company hierarchy?
>
> (4) Place and method of interrogation, e.g., was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?
>
> (5) Truthfulness of the reply.

*Id.* at 48; *see also Chauffeurs, Local 633 v. NLRB,* 509 F.2d 490, 494 (D.C.Cir.1974). Determining whether employee questioning violates the Act does not require strict evaluation of each factor; instead, "[t]he flexibility and deliberately broad focus of this test make clear that the *Bourne* criteria are not prerequisites to a finding of coercive questioning, but rather useful indicia that serve as a starting point for assessing the 'totality of the circumstance.'" *Timsco Inc. v. NLRB,* 819 F.2d 1173, 1178 (D.C.Cir.1987).

 Reviewing the entire record and the Board's decision and "'recogniz[ing] the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relation-ship,'" *Southwire Co. v. NLRB,* 820 F.2d 453, 456 (D.C.Cir.1987) (quoting *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)), we think the Board properly applied the *Bourne* factors and that its section 8(a)(1) finding is supported by substantial evidence. Employee Willie Jackson testified that during a meeting with about fifty employees on or about May 19, Chappell asked whether "our homes and everything had been visited, you know, by the union associate." According to Jackson, he and one other man raised their hands in response. Chappell denied that the meeting ever occurred, but the ALJ discredited his testimony, credited Jackson's testimony instead, and found that Chappell had questioned employees in violation of section 8(a)(1). The ALJ said:

> The setting of the interrogation was a general meeting of employees and the record does not reflect that the union sympathies of those present were known to [Perdue]. The questioner was a high official of [Perdue] who gave no assurances that by asking the question the employees would have nothing to fear. Additionally, Chappell was from the Maryland headquarters and did not have any established friendly relationship with the Alabama workers. There was no apparent legitimate reason for the question, but by seeking this information [Perdue] could learn who had been talking to the Union's organizers.

*Cooking Good Div.,* 323 N.L.R.B. No. 50, at 5, 1997 WL 156724.

Although we agree with Perdue that the "place and method" of Chappell's questioning of employees (the fourth *Bourne* factor) were not particularly coercive, the other *Bourne* factors support the Board's finding of unlawful interrogation. Chappell came from Perdue's headquarters and served as its top human resources supervisor (factor 3). *See Bourne,* 332 F.2d at 48; *Midwest Reg. Joint Bd., Amalgamated Clothing Workers of Am.,* 564 F.2d 434, 443 (D.C.Cir.1977). In his questions to employees, Chappell appeared to seek information about individual employee union sympathies (factor 2). *Cf. Allegheny Ludlum Corp. v. NLRB,* 104 F.3d 1354, 1359 (D.C.Cir.1997) ("'[A]ny attempt by an

employer to ascertain employee views and sympathies regarding unionism generally tends to cause fear of reprisal in the mind of the employee if he replies in favor of union- ism and, therefore, tends to impinge on his [statutory] rights.'") (quoting *Struksnes Constr. Co.*, 165 N.L.R.B. 1062, 1062 (1967)). Perdue claims that the ALJ considered cir- cumstances outside the *Bourne* factors, *i.e.*, that Chappell "gave no assurances that by asking the question the employees would have nothing to fear," *Cooking Good Div.* 323 N.L.R.B. No. 50, at 5, 1997 WL 156724, but both this court and the Board have found that failure to give such assurances is rele- vant to the unlawful interrogation determina- tion. *See Midwest Reg. Joint Bd.*, 564 F.2d at 443; *Fiber Glass Sys., Inc.*, 298 N.L.R.B. 504, 504–05, 1990 WL 123341 (1990).

Challenging the ALJ's finding that Chap- pell had no legitimate reason to interrogate employees, Perdue claims that because it had received complaints that Union organizers were representing themselves as Perdue agents when visiting employees in their homes, it needed to know the answers to Chappell's questions to gauge the reach of the Union's misrepresentations. But Perdue received the complaints over a month before the Union filed its election petition, the com- pany immediately met with employees to warn them that Union organizers represent- ing themselves as Perdue agents were re- portedly visiting employee homes, and the meeting at which Chappell questioned em- ployees occurred over two months later, a week after the election had been scheduled. Because Perdue never claimed that it was still receiving complaints at that time, we think the record supports the Board's conclu- sion that Chappell had no legitimate reason for asking the question.

### June 14 Wage Adjustment

■ The day before the election, on June 14, Perdue informed employees that they would receive an eighty-cents-per-hour pay increase, in part to replace the predecessor company's attendance bonus program under which employees received bonuses for per- fect attendance. Acknowledging that the amount of the wage adjustment was not "out of the ordinary," the Board concluded that its timing was nevertheless "troubling" because

"it would be reasonable for the employees to view the timing of the raise as designed to influence their voting in the election." *Cook- ing Good Div.*, 323 N.L.R.B. No. 50, at 9, 1997 WL 156724.

■ The Supreme Court has inter- preted section 8(a)(1) to prohibit "conduct immediately favorable to employees which is undertaken with the express purpose of im- pinging upon their freedom of choice for or against unionization and is reasonably calcu- lated to have that effect." *NLRB v. Ex- change Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Granting bene- fits does not violate the Act if it occurs "in the normal course of the business of an em- ployer, without any motive of inducing em- ployees to vote against the union." *Pedro's Inc. v. NLRB*, 652 F.2d 1005, 1008 (D.C.Cir. 1981). Put another way, "[a]s a general rule, an employer's legal duty in deciding whether to grant benefits while a representation pro- ceeding is pending is to decide that question precisely as it would if the union were not on the scene." *United Airlines Servs. Corp.*, 290 N.L.R.B. 954, 954, 1988 WL 214002 (1988). Both the decision to confer benefits and the timing of the announcement of such benefits are subject to "in the normal course of business" analysis: "[T]he timing of the announcement of a wage increase may violate section 8(a)(1), 'even though the employer's initial decision to raise wages was perfectly legitimate.'" *St. Francis Fed. of Nurses and Health Prof. v. NLRB*, 729 F.2d 844, 850 (D.C.Cir.1984) (quoting *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 151 (2d Cir.1981)).

Perdue claims that it always intended to follow the previous owner's practice of grant- ing wage increases between June 1 and July 1 and that the timing of the wage adjustment occurred "in the normal course of business." "Doubt[ing]" these assertions, the Board found that the company offered no documen- tary evidence that it intended to follow the practices of the predecessor company, that Perdue "never told employees to expect rais- es in June," and that the employees' "first knowledge of when the raises would be re- ceived was the day before the election." *Cooking Good Div.*, 323 N.L.R.B. No. 50, at 9, 1997 WL 156724. Evidence in the record

supports these findings. One employee testified that in January, shortly after Perdue acquired the Dothan processing plant, it told employees it would increase wages and eliminate the attendance bonus, but that it gave no timetable. Responding to the Union's organizing efforts, the vice president and general manager of Perdue's Dothan division, Larry Winslow, sent a March 30 letter to all employees explaining the company's plans with regard to changes in wages and benefits, but acknowledging that Perdue had no "exact timetable for those decisions." The Winslow letter merely promised improved benefits and wages "[i]n the next few months." Employees who later asked when the company would adjust wages and benefits testified they received vague responses. One employee testified that when she asked Jimmy Chappell about wages and benefits, he responded "July 1"; but when she asked him the same question on another occasion, "he said that he didn't want to give [the] exact date of July 1, because he didn't want to say July 1 and it wasn't." Another employee testified that when Chappell was asked about pay raises at a May meeting, he replied that he "couldn't give us any information on a pay increase, but that there was supposed to be a person coming later to discuss the pay increase." In sum, the record supports the Board's finding that Perdue neither promised a mid-June wage adjustment nor informed Dothan employees that it intended to follow the predecessor's practice of awarding annual wage adjustments in June or early July. Thus, even if the predecessor company's practice was to announce wage adjustments only days before they were to take effect, as Perdue contends, because Dothan employees had no reason to know Perdue was following the predecessor's practice, they could reasonably have viewed the election eve announcement as an attempt to discourage their support for the Union.

Both Perdue and our dissenting colleague argue that June 14 was the only day Perdue could safely grant a wage increase because any deviation from that date would have risked a Board finding that it accelerated or postponed the increase in order to influence the election. This argument ignores not only that the Board's finding of a section 8(a)(1) violation rested on the company's failure to inform its employees that it intended to follow its predecessor's practice, but also the fact that the predecessor's practice was to raise wages, not on June 14, but anytime between June 1 and July 1. By failing to announce that it intended to follow its predecessor's practice and by announcing the pay increase on the eve of the election, Perdue put itself in the worst possible position to claim that it had not attempted to influence the election.

■ Our dissenting colleague also criticizes the Board's case law regarding wage increases implemented prior to elections. *See* Diss. Op. at 839. Perdue, however, makes no such argument, and normally we do not address issues the parties fail to raise. *See Ryan v. Bentsen,* 12 F.3d 245, 249 n. 5 (D.C.Cir.1993).

### *June 13 Change in Attendance Policy*

■ Challenging the Board's conclusion that it violated section 8(a)(1) by announcing a change in its attendance policy two days before the election in order to "discourage the employees' support for the Union," *Cooking Good Div.,* 323 N.L.R.B. No. 50, at 10, 1997 WL 156724, Perdue argues not that it implemented the change for some reason other than to influence the election, but rather that in June 1995, it made *no* change in the policy. We think the record contains sufficient evidence to support the Board's contrary finding. Dothan employee Bryan Smith testified that he attended a June 13 meeting where Supervisor Tony Williams told employees that the company was changing the attendance policy. Although admitting that he first learned the specific details of the old policy at the meeting, Smith testified that under that policy employees were "written up" the first time they were late or missed a day, and that Williams described the new policy as "when you missed a day, that would count as half an occurrence. And that if you missed two days, that was like, then you missed the whole day, so then you got ... wrote up." As corroboration for Smith's testimony, the Board pointed to a June 30 memorandum (two weeks after the election) from senior human resources representative Ed Scarborough, stating:

We are having more associates to come in late to work [sic], since we do not have the attendance bonus and each late is a-half of an occurance [sic] against your attendance record. An associate that is late (2) two times has the equal of (1) one whole occurance [sic], which is the same as missing one full day and it may cause you to get a written letter of warning and may even cause termination if your record is already bad. We ask that each of you be on time so that you will not have your attendance record be a bad reflection on you.

According to Perdue, the Scarborough memorandum simply reminded employees that the predecessor company's attendance policy remained in effect. The Board interpreted the memorandum differently: "The message in this memo is that [Perdue] has made . . . changes relative to the elimination of the attendance bonus and the calculation of occurrences." *Cooking Good Div.*, 323 N.L.R.B. No. 50, at 10, 1997 WL 156724. We think the Board's interpretation is not unreasonable. The memorandum cites two reasons for increased tardiness: the elimination of the attendance bonus and the treatment of each instance of tardiness as one-half of an occurrence. The Board read the memorandum to mean that the latter, like the former, resulted from a recent change in policy at Dothan. Although Perdue offers an equally plausible interpretation of the memorandum, the standard under which we review Board findings does not permit us to "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We will thus not disturb the Board's finding that the June 30 memorandum signaled that the attendance policy changed in June 1995.

Perdue points to Scarborough's testimony that the company did not change the attendance policy until January 1996, six months after the election. Even if true, Scarborough's testimony does not undermine the Board's finding that Perdue also changed the policy in June 1995. Although Scarborough's testimony (that the change occurred in January 1996) differs from Smith's (that the poli-

cy changed in June 1995), so long as the record contains substantial evidence supporting the Board's findings, as it does here, we defer to the Board's analysis, even if other evidence in the record could support an alternative determination. *See Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 938 (D.C.Cir.1998); *see also Synergy Gas Corp.*, 19 F.3d at 651.

Finally, to the extent that Perdue challenges Smith's credibility, it has failed to meet the heavy burden required to overturn a credibility determination. " '[C]redibility determinations may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its fac[e] incredible.' " *E.N. Bisso & Son, Inc. v. NLRB*, 84 F.3d 1443, 1445 (D.C.Cir.1996) (quoting *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1563 (D.C.Cir.1984)). The ALJ "credit[ed] Smith's testimony that Williams did announce a change in the attendance system to a less severe method at the June 13 meeting." *Cooking Good Div.*, 323 N.L.R.B. No. 50, at 10, 1997 WL 156724. While not expressly based upon observation of the witness's demeanor, the ALJ's decision to credit Smith's testimony reflected his consideration of conflicting testimony from Williams and Scarborough, as well as of Scarborough's June 30 memorandum. Although Smith admitted that his memory of the June 13 meeting was "not good," and although he needed to refresh his recollection before testifying, his testimony was neither incredible nor did it become so simply because he was not completely certain of every detail of the meeting. Because Perdue has failed to demonstrate "extraordinary circumstances," we decline to overturn the ALJ's decision to credit Smith's testimony. *See NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C.Cir.1988) (refusing to overturn an ALJ's credibility determination because, after evaluating conflicting testimony, the ALJ credited one version of the evidence presented).

**IV**

We deny Perdue's petition for review. Except for the Board's section 8(a)(3) findings,

we grant its cross-application for enforcement.

*So ordered.*

RANDOLPH, Circuit Judge, dissenting in part:

When a traffic light simultaneously blinks "Stop" and "Go" everyone knows repairs are needed. If a motorist encountering the light proceeds ahead while another motorist pauses, it is unimaginable that both would be guilty of failing to heed the signal. The Board's "law" governing pre-election wage increases is like the faulty traffic light and the Board's enforcement of that "law" approaches the unimaginable. As the Board sees it, when yearly wage increases are the norm, and the one-year anniversary falls just before a representational election, employers who proceed to grant a raise on that date are illegally trying to influence the vote. The Board also believes that employers who hold back and let the date pass are just as guilty of an unfair labor practice. Board theory one is that a company giving the raise demonstrates its power over its employees, implicitly threatening them with the removal of benefits should they vote for the union; Board theory two is that a company postponing the wage increase until after the election unfairly attempts to scare its employees into voting against the union. Theory one has received the Supreme Court's blessing, *see NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), and it has also received severe criticism. *See* Derek C. Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 HARV. L. REV. 38, 113 (1964); ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW: UNIONIZATION AND COLLECTIVE BARGAINING 164 (1976). Regardless of how Board theory one is judged working alone, when it is considered in tandem with Board theory two it rises—or more accurately falls—to the level of arbitrariness. Many courts and administrative law judges have expressed exasperation with the Board's Janus-faced doctrine. *See, e.g., Pedro's, Inc. v. NLRB,* 652 F.2d 1005, 1008 n. 8 (D.C.Cir.1981); *J.J. Newberry Co. v. NLRB,* 645 F.2d 148, 151 (2d Cir.1981); *Free–Flow Packaging Corp. v. NLRB,* 566 F.2d 1124, 1130 (9th Cir.1978); *NLRB v. Otis Hosp.,* 545 F.2d 252, 255 (1st Cir.1976); *Osco Drug, Inc.,* 237 N.L.R.B. 231, 232–33, 1978 WL 7813 (1978). Why the Board does not call a halt to this nonsense is unfathomable. The Board plainly has the power do so. Through its Regional Directors, the Board can simply schedule elections at a time removed from the historical anniversary date for unit wage increases.

Substantial evidence does not, in any event, support the Board's finding that Perdue gave the wage increases on June 14, 1995, in order to influence the election scheduled for the next day, and thereby violated § 8(a)(1). Perdue acted on June 14 because the Board's bewildering doctrine gave the company no other realistic option. Perdue took over the Dothan, Alabama plant early in 1995. In previous years, employees at the plant received their annual pay raises between June 1 and July 1. In 1994, wage increases at Dothan were granted on June 15, the first day of the new pay period. We have held that employers may give wage increases prior to an election "in the normal course of [ ] business," *Pedro's,* 652 F.2d at 1008, and "in a manner and at a time in accord with past practice," *Allen v. NLRB,* 561 F.2d 976, 981 (D.C.Cir.1977). There can be no dispute that it was Perdue's "normal" practice to maintain an acquired company's customary date for granting a pay raise. At Dothan, only one day naturally suggested itself as the customary date: June 14, 1995, which as in the 1994 Dothan raise, represented the first day of the new pay period. Only that date could clearly be considered "in the normal course of business" at Dothan, and in compliance—if not with the precedents of the Board—at least with the decisions of this court.

The obvious question is "What should the company have done differently?" One idea is that before the election Perdue should have announced (1) that it was withholding granting a wage increase on the customary date in order to avoid the appearance of attempting to "bribe" employees to vote against the union, but (2) that it would grant the raise after the election no matter what the outcome. But in terms of the effect on employees, there is only one difference be-

tween the company's granting the wage increase on June 14 and giving a promise that the increase will occur on June 16, or some other time shortly after the election. The difference is not that the employees will feel less threatened by the company. The difference is that the announce-the-raise-but-give-it-later approach means employees will not get their raise on the customary date and thus will lose money. Who may the employees blame? Maybe the union. Better yet, the Board, and the courts who go along with the Board. As an alternative one might suppose that Perdue should have postponed the wage increase but made it retroactive to June 14. But by any measure there is no difference between announcing a wage increase on June 14, and announcing that a wage increase will be granted after the election, retroactive to June 14. In any event, both of these options, and others, erroneously place the burden on Perdue to alter its normal business practice to accommodate the union election. *See Newport Div. of Wintex Knitting Mills,* 216 N.L.R.B. 1058, 1058, 1975 WL 5400 (1975).

I wish also to explain why I would reject the Board's conclusion that on June 13, two days before the election, Perdue relaxed Dothan's attendance disciplinary policy in order to influence votes, and thereby violated § 8(a)(1). *See Cooking Good Div.,* 323 N.L.R.B. No. 50, at 9–10, 1997 WL 156724 (Mar. 31, 1997). The evidence of any such change in policy is slim to nil. The Board relied chiefly on the testimony of employee Bryan Smith, who said he attended a meeting held by manager Tony Williams. At first, Smith could not recall Williams discussing such a policy change, nor could he remember the date of the meeting, or whether it was close to the election. Smith also testified that he had no knowledge of the attendance policy in place before the meeting. Only after reviewing his affidavit was Smith able to give June 13 as the meeting date. Smith then said Williams announced that the

attendance policy "changed" so that "when you missed a day, that would count as half an occurrence. And that if you missed two days, that was like, then you missed the whole day, so then you got write [sic] up...." J.A. 112. How Smith could take this as a "change" in policy when he admitted not knowing the existing policy is a mystery. Williams, on the other hand, flatly denied announcing any change to the attendance disciplinary policy at any time and Ed Scarborough, the human resources representative at Dothan, testified that Perdue first altered this policy on January 15, 1996—six months after the election.

Scarborough also testified that he was very familiar with the attendance disciplinary policy instituted by the previous employer, which he described as follows:

> The first two times you are just verbally warned about being absent; the third time you was [sic] out was a written warning; the next time was a one-day suspension; the next time a three-day; and then termination.[1]

J.A. 276. This matches the description of the "change" Smith said he heard about at the June 13 meeting.

The Board also relied on a memo by Scarborough issued to employees on June 30, 1995. *See Cooking Good Div.,* 323 N.L.R.B. No. 50, at 10, 1997 WL 156724. But the document merely describes the existing attendance policy established by the previous employer: "An associate that is late (2) two times has the equal of (1) one whole occurrence, which is the same as missing one full day and it may cause you to get a written letter of warning...." J.A. 339.

No one produced any written record of a policy change and not a single witness had a clear memory of any easing of the attendance policy before the election. If Perdue's goal had been to influence the election, one would have expected it to broadcast the new policy

---

1. Scarborough described the new Perdue attendance policy implemented on January 15, 1996: The first two times you are [absent], there is just nothing done about it, you are free; the third time you are out, you receive a written verbal [sic] warning; the next time you get a second warning; the third is a final warning; and then the fourth we give a three-day sus-

pension pending investigation of our records to make sure that our records are correct. If they are correct, when they get the three-day suspension, they are term[inat]ed. They can work off an incident, though every 28 days with Perdue.

J.A. 277–78.

loudly and clearly. Yet on this matter of importance to employees, there was no proof of any widespread knowledge among them. Given this state of affairs, there was no substantial evidence that Perdue made any policy change, let alone that it intended to influence the election.