# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 27, 2015          Decided June 30, 2015

No. 13-1274

INDEPENDENT PRODUCERS GROUP,
APPELLANT

v.

LIBRARIAN OF CONGRESS, REGISTER OF COPYRIGHTS, AND
COPYRIGHT ROYALTY BOARD,
APPELLEES

MOTION PICTURE ASSOCIATION OF AMERICA, INC., ET AL.,
INTERVENORS

Consolidated with 13-1296

On Appeal From The Copyright Royalty Board

*Brian D. Boydston* argued the cause and filed the briefs for appellant Independent Producers Group.

*Sonia K. McNeil*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Stuart F. Delery*, Assistant Attorney General at the time the brief was filed, and *Mark R. Freeman*, Attorney.

*Charles G. Curtis, Jr.* argued the cause for intervenor-appellees Joint Sports Claimants. *Gregory O. Olaniran* argued the cause for intervenor-appellees MPAA-Represented Program Suppliers. With them on the joint brief were *Robert Alan Garrett* and *Lucy Holmes Plovnick*.

*Ronald G. Dove, Jr.*, *Lindsey L. Tonsager*, *John I. Stewart, Jr.*, *Jennifer Burdman*, *Ann Mace*, *L. Kendall Satterfield*, *Victor J. Cosentino*, *Gregory A. Lewis*, and *Samuel Mosenkis* were on the joint brief for *amici curiae* Commercial Television Claimants, Public Television Claimants, Music Claimants, Canadian Claimants Group, and National Public Radio in support of appellees.

*Brian D. Boydston* was on the brief for intervenor Independent Producers Group in support of appellees.

Before: BROWN, KAVANAUGH, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Under the Copyright Act, cable systems may retransmit over-the-air broadcasts of copyrighted material so long as they pay compulsory royalty fees for using that copyrighted material. The Librarian of Congress supervises the process of collecting, allocating, and distributing those fees. As part of the process, the Copyright Royalty Board – which is appointed by the Librarian of Congress – conducts regular proceedings to determine how to distribute royalty fees. Independent Producers Group, known as IPG, represented several copyright owners in the 2000-03 royalty fee distribution proceeding. According to IPG, the Board erred in determining IPG's royalty fees in the sports

programming and program suppliers categories. IPG now appeals. We affirm the Board's determination as to IPG's royalty fees in those categories.

I

The Copyright Act balances two important policies: "ensuring the protection of intellectual property and encouraging the free flow of information." *National Cable Television Association v. Copyright Royalty Tribunal*, 689 F.2d 1077, 1078-79 (D.C. Cir. 1982).

That balancing act is evident in the royalty fee provision at issue in this case. Under 17 U.S.C. § 111(c), after a broadcast television station transmits copyrighted material to its viewers, cable systems may retransmit that material without first obtaining the copyright owner's permission. In exchange for that privilege, cable systems must deposit statutorily prescribed royalty fees with the Register of Copyrights. *Id.* § 111(c), (d).

The Copyright Royalty Board is responsible for determining how to distribute those fees to the appropriate copyright owners. *Id.* § 801(b)(3). In July of each year, any copyright owner who claims part of that year's pot of royalty fees – or an agent of that copyright owner – must file a claim with the Board. *Id.* § 111(d)(4)(A). Based on those claims, the Board determines "whether there exists a controversy concerning the distribution of royalty fees." *Id.* § 111(d)(4)(B).

If all claimants agree how to distribute the royalty fees, then the Board authorizes the Librarian of Congress to distribute the fees. *Id.* §§ 111(d)(4)(B)-(d)(4)(C), 801(b)(7). If the claimants cannot reach an agreement, however, the

Board must "conduct a proceeding to determine the distribution of royalty fees." *Id.* § 111(d)(4)(B); *see id.* § 801(b)(3)(B).

Royalty fee distribution proceedings have two phases. During Phase I, claimants may group themselves into categories based on the kind of programming that they own. *See* 37 C.F.R. § 351.1(b)(2)(ii) (permitting claimants to file joint petitions to participate in Phase I proceeding); 75 Fed. Reg. 26,798, 26,798 (May 12, 2010) (listing categories for 2000-03 Phase I distribution proceeding). Using evidence supplied by the claimants, the Board calculates the marketplace value of each category. It then assigns a percentage of the total royalty fee fund to each category based on its value relative to other categories. *See, e.g.*, *id.* at 26,807 (assigning percentages); *see also* 37 C.F.R. § 351.1(b)(2)(i)(B). During Phase II, the Board subdivides the fees allotted to each category among the individual claimants within that category. *See id.* § 351.1(b)(2)(i)(B).

Phase I and Phase II proceedings follow the same set of procedures. First, the Board publishes a notice of the proceeding in the Federal Register. 17 U.S.C. § 803(b)(1)(A)(i); *see* 73 Fed. Reg. 18,004 (Apr. 2, 2008) (notice of Phase I proceeding for 2000-03); 76 Fed. Reg. 7,590 (Feb. 10, 2011) (notice of Phase II proceeding for 2000-03). Claimants then petition to participate in the proceeding. *See* 17 U.S.C. § 803(b)(1). A three-month voluntary negotiation period ensues, during which the participating claimants attempt to reach an agreement without assistance from the Board. *Id.* § 803(b)(3).

At the end of the voluntary negotiation period, if any disputes remain, the Board plays a more active role in the process. *See* 37 C.F.R. § 351.3(a). The Board accepts written

statements from the participating claimants, allows the participating claimants to conduct discovery, and orders a post-discovery settlement conference. *See* 17 U.S.C. § 803(b)(6)(C); 37 C.F.R. §§ 351.4-351.7. If the participating claimants are still unable to resolve their differences, the Board then conducts a hearing and issues a final determination. *See* 17 U.S.C. § 803(c)(1); 37 C.F.R. §§ 351.8-351.12. Finally, the Librarian of Congress publishes the Board's determination in the Federal Register and distributes the royalty fees. *See* 17 U.S.C. § 803(c)(6).

The Board's published determinations are subject to judicial review in this Court under 17 U.S.C. § 803(d)(1). We may set aside a determination "only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if the facts relied upon by the agency have no basis in the record." *SoundExchange, Inc. v. Librarian of Congress*, 571 F.3d 1220, 1223 (D.C. Cir. 2009) (citations and internal quotation marks omitted); *see* 17 U.S.C. § 803(d)(3) (Section 706 of the Administrative Procedure Act applies to judicial review of royalty fee distribution determinations).

II

Independent Producers Group, or IPG, represents several claimants who, by IPG's tally, own the copyrights for over 1,000 television programs. IPG challenges the Board's 2000-03 Phase II determination in the sports programming and program suppliers categories.[1]

---

[1] In broad strokes, the sports programming category includes live telecasts of professional and college team sports, and the program suppliers category includes syndicated series, specials, and movies.

IPG chose not to participate in Phase I of the 2000-03 distribution proceeding. *See* 75 Fed. Reg. 26,798, 26,799 (May 12, 2010) (listing participants). During Phase I, the participating claimants grouped themselves into eight categories, relying on the traditional definitions of those categories, and reached a partial settlement. They were not, however, able to reach a full settlement concerning the allocation of royalty fees across the eight categories. The Board therefore conducted a hearing and published a Phase I determination that allocated the royalty fees. *See id.* at 26,798-99.

Claimants in the sports programming and program suppliers categories were subsequently unable to agree on how to divide up the royalty fees within those categories. *See* 76 Fed. Reg. 7,590, 7,591 (Feb. 10, 2011).[2] The Board therefore commenced a Phase II proceeding. This time, IPG participated in the proceeding. *See* 78 Fed. Reg. 64,984, 64,984 (Oct. 30, 2013). Two other entities also participated: the Motion Picture Association of America, or MPAA, which represents non-IPG claimants in the program suppliers category, and the Joint Sports Claimants, a consortium of non-IPG claimants in the sports programming category.

As a threshold matter, MPAA and the Joint Sports Claimants disputed IPG's authority to represent certain claimants in the sports programming and program suppliers categories. The Board held a preliminary evidentiary hearing

---

[2] Claimants in the devotional programming category were also unable to reach an agreement and therefore participated in the Phase II proceeding. *See* 76 Fed. Reg. at 7,591. IPG's appeal does not involve the devotional programming category.

on that subject and issued two orders resolving the dispute. *See id.* at 64,987.

The orders disposed of all of IPG's sports programming claims. *See id.* at 64,984 n.2, 64,987. The Board concluded that IPG had not established its authority to represent the Fédération Internationale de Football Association (better known as FIFA) and dismissed IPG's claims on behalf of FIFA. The Board also determined that IPG's claims on behalf of the U.S. Olympic Committee belonged in the program suppliers category, not the sports programming category. Because IPG had no remaining claims in the sports programming category, the Board subsequently distributed all royalty fees in that category to the Joint Sports Claimants.

The orders also dismissed some, but not all, of IPG's claims in the program suppliers category. The Board therefore held a full evidentiary hearing to divide up the royalty fees in that category. *See id.* at 64,985. IPG and MPAA proposed competing methodologies for calculating the marketplace value of their claims and allocating royalty fees. In its final Phase II determination, the Board largely adopted MPAA's methodology. *See id.* at 64,993-65,002.

IPG promptly appealed the Phase II determination with respect to both the sports programming and program suppliers categories. MPAA and the Joint Sports Claimants intervened.

III

IPG appeals the rejection of its sports programming claims as arbitrary and capricious, and as a violation of the

Board's statutory mandate to follow precedent established by prior determinations.[3]

A

The Board disposed of IPG's sports programming claims in two orders, and then authorized the distribution of royalty fees for that category to the Joint Sports Claimants. The Board now contends that its orders are not subject to judicial review because they are not final determinations published in the Federal Register. We disagree and conclude that we have authority to proceed.

Under 17 U.S.C. § 803(d)(1), we may review appeals from any "determination" of the Board under 17 U.S.C. § 803(c), so long as the appeal occurs within thirty days after publication in the Federal Register. The appellant must be an "aggrieved participant in the proceeding under [17 U.S.C. § 803(b)(2)] who fully participated in the proceeding and who would be bound by the determination." *Id.* § 803(d)(1). In *Independent Producers Group v. Library of Congress*, we construed Section 803(d)(1) to permit judicial review when the Board resolves a contested proceeding and publishes a determination, but not when royalty fee claimants reach a settlement agreement and the Board merely gives effect to that agreement. *See* 759 F.3d 100, 105-07 (D.C. Cir. 2014).

In this case, there is no question that the Board issued a final determination distributing royalty fees under Section 803(c). *See* 78 Fed. Reg. 64,984 (Oct. 30, 2013). There is

---

[3] The Board must act in accordance with "prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright arbitration royalty panels . . . , and the Copyright Royalty Judges . . . , and decisions of the court of appeals under this chapter." 17 U.S.C. § 803(a)(1).

similarly no question that IPG is an "aggrieved participant" who participated fully in the Phase II proceeding. IPG properly petitioned to participate in the proceeding, appears to have paid the requisite fees, and had its contentious dispute with the Joint Sports Claimants resolved by the Board. *See* 17 U.S.C. § 803(b)(2). Thus, the sole question is whether the Board's orders disposing of IPG's claims are part and parcel of the final determination, such that we may review them, or instead are protected from judicial review.

We conclude that the orders are subject to judicial review as part of the Board's final determination. The Board issued its orders during an active distribution proceeding under its authority to issue "necessary procedural or evidentiary rulings" at any stage of a distribution proceeding. *Id.* § 801(c). Such interlocutory orders in an agency proceeding are normally reviewable at the end of the proceeding. *See CSX Transportation, Inc. v. Surface Transportation Board*, 774 F.3d 25, 28 (D.C. Cir. 2014) (agency interlocutory decision reviewable at conclusion of adjudication). The parties point to nothing in the Copyright Act that suggests that the Board's interlocutory orders are subject to a different rule. If we were to conclude otherwise, we would frustrate the statutory scheme for judicial review of royalty fee distribution proceedings. The Board would be able to insulate hotly contested decisions from judicial review simply by fast-tracking those decisions and excluding them from its published determination.

We have jurisdiction to review the merits of IPG's claims.

B

We now turn to IPG's objections to the Board's determination respecting the sports programming category. IPG first contests an evidentiary sanction that the Board imposed during the preliminary evidentiary hearing. In IPG's view, that sanction was arbitrary and capricious because: (1) IPG had complied with its discovery obligations, and (2) even if IPG's conduct warranted a sanction, the sanction chosen by the Board was too severe.

During discovery, the Board ordered IPG to produce materials relevant to its relationship with FIFA. *See* November 13, 2012 Hearing Tr. at 269, Joint Appendix at 2800 ("IPG is directed to produce, to the extent it has not already done so, all documents regarding its authority to claim royalties on FIFA's behalf or state that no additional documents exist."). IPG interpreted that order as requiring it to produce only documents that helped – rather than hurt – its claim of authority to represent FIFA. At the preliminary evidentiary hearing, the Joint Sports Claimants objected that IPG had withheld responsive materials. IPG responded that its production complied with the plain terms of the discovery order and with the law governing discovery in distribution proceedings. The Board disagreed and sanctioned IPG by excluding several of its exhibits.

That sanction was not arbitrary and capricious. The Board reasonably responded to a blatant discovery violation by IPG.[4]

---

[4] The Board may impose discovery sanctions as a consequence of its statutory grant of authority to oversee discovery. *See* 17 U.S.C. §§ 801(c), 803(b)(6)(C) (granting Board authority to order discovery and compel production of documents); *Atlantic Richfield Co. v. Department of Energy*, 769 F.2d 771, 775, 795-96 (D.C. Cir.

First, an evidentiary sanction was an entirely appropriate response to IPG's discovery violation. We review the Board's determination that IPG did not comply with its discovery obligations with "extreme deference" because the "conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance." *Hi-Tech Furnace Systems, Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000) (internal quotation marks omitted). Reviewed in that deferential light, the evidence makes clear that IPG had no cause to believe that it could withhold prejudicial evidence. The discovery order directed IPG to produce "all documents regarding its authority to claim royalties on FIFA's behalf." November 13, 2012 Hearing Tr. at 269, Joint Appendix at 2800. The order plainly required IPG to produce evidence that might undermine its assertion of authority to represent FIFA. The Copyright Act and the Board's regulations are consistent with the understanding that discovery related to an opposing party's claim encompasses all relevant evidence – including evidence that may tend to undermine that claim. 17 U.S.C. § 803(b)(6) (discovery "in connection with" participating claimants' written statements permitted); 37 C.F.R. § 351.6 (parties "may request of an opposing party nonprivileged underlying documents related to the written exhibits and testimony"). It was therefore not arbitrary and capricious for the Board to sanction IPG for violating the discovery order.

Second, IPG contends that the sanction that the Board chose was needlessly draconian. Excluding evidence, however, is a permissible response to discovery order

1985) (plenary grant of adjudicative authority to agency extends to imposition of sanctions when necessary to ensure fairness and maintain integrity of adjudicative process).

violations in certain circumstances. *See, e.g.*, *Perdue Farms, Inc., Cookin' Good Division v. National Labor Relations Board*, 144 F.3d 830, 834 (D.C. Cir. 1998); *cf.* Fed. R. Civ. P. 37(b)(2)(A) (listing exclusion of evidence as acceptable sanction for failure to comply with discovery order). An exclusion order "prevents the party frustrating discovery from introducing evidence in support of his position on the factual issue respecting which discovery was sought." *Perdue Farms*, 144 F.3d at 834 (internal quotation marks omitted). Without such a rule, "a party served with a discovery order in the course of an administrative adjudicatory proceeding has no incentive to comply, and ofttimes has every incentive to refuse to comply." *Id.* (internal quotation marks omitted). IPG offers no basis for concluding that such a run-of-the-mill sanction was unduly harsh, let alone arbitrary and capricious, in this case.[5]

C

The Board determined that IPG's claims on behalf of the U.S. Olympic Committee did not belong in the sports programming category, based on the category definitions to which the Phase I participants had agreed.[6] The Board declined to permit IPG to challenge those category definitions during the Phase II proceeding. IPG contends that the Board's refusal to reopen the category definitions during the Phase II proceeding was arbitrary and capricious, and violated

---

[5] IPG also alleges that the sanction violated its due process rights. But the sanction was consistent with due process principles. IPG received sufficient notice that it might be sanctioned. IPG then had the opportunity to defend itself at a Board hearing.

[6] The Phase I participants defined sports programming as "Live telecasts of professional and college team sports broadcast by U.S. and Canadian television stations, except for programs coming within the Canadian Claimants category."

the Board's obligation to adhere to precedent established by prior determinations. Neither contention has merit.

The Board's refusal to allow IPG to belatedly challenge the Phase I category definitions during Phase II was not arbitrary and capricious. During Phase I, the Board assigns each category a percentage of a fixed pot of royalty fees based on the value of the claims in that category. If the Board were to revise the category definitions during Phase II, some claims could shift between categories. The relative value of those categories would therefore change. That change in relative value would require the Board to revise its Phase I royalty fee allocation (and possibly even to claw back past royalty fee distributions).[7] There would, in short, be no purpose to holding a separate Phase I proceeding if it were impossible to finalize the allocation of royalty fees across categories before moving on to Phase II.

Nor did the Board violate its statutory obligation to adhere to precedent established by prior determinations when it applied the agreed-upon definition of "sports programming." *See* 17 U.S.C. § 803(a)(1). IPG argues that the Board departed from precedent established in a past distribution determination. In that determination, the Copyright Royalty Tribunal (a predecessor of the Board), specified that Phase I categories apply "to generic categories of programs." 49 Fed. Reg. 37,653, 37,656 (Sept. 25, 1984). IPG takes that to mean that, under binding precedent, "sports programming" must include any programming of any sporting event. But IPG takes the statement out of context. Read in context, it is evident that the Tribunal was not establishing a

---

[7] The Board may authorize the partial distribution of royalty fees even if some disputes have yet to be resolved. *See* 17 U.S.C. §§ 111(d)(4)(C), 801(b)(3)(C).

definition of "sports programming," but was simply acknowledging that "sports programming" – whatever its contours – was a generic category. IPG points to no Board precedent that has said that the "sports programming" category encompasses all programming of any sporting event.

In sum, no basis exists for overturning the Board's reasoned decision to reject IPG's sports programming claims on behalf of FIFA and the U.S. Olympic Committee.

IV

IPG also appeals three aspects of the Board's determination related to the program suppliers category: (1) the Board's decision to allow MPAA to represent certain claimants without submitting additional documentation of its authority to do so; (2) the Board's dismissal of several of IPG's claims; and (3) the Board's reliance on MPAA's methodology for allocating royalty fees among claimants.

A

IPG objects to the Board's decision to allow MPAA to proceed with claims on behalf of 615 claimants without first producing additional evidence of its authority to represent those claimants.

The Board required IPG to provide evidence of its agreements with the claimants IPG purported to directly represent. The Board did not, by contrast, require MPAA to provide evidence of its agreements with the 615 claimants challenged by IPG. Instead, MPAA supplied only representation agreements with agents who in turn represented the claimants. IPG argues that this alleged

discrepancy in treatment was arbitrary and capricious, and a violation of due process.

IPG's contention fails because the Board did not in fact apply different standards to IPG and MPAA. The Board's practice was first to require a minimum level of documentation and then to request more if any evidence called "into question" a participant's authority to act as an agent, such as "a disavowal of representation by an underlying claimant or evidence that the claimant is represented by another party." 78 Fed. Reg. 64,984, 64,988 (Oct. 30, 2013). No claimant objected to MPAA's authority to act, via an agent, on the claimant's behalf. *See id.* By contrast, several claimants disavowed IPG's representation. *See id.* The Board's decision to require additional documentation from IPG but not from MPAA was therefore not arbitrary and capricious, or a violation of due process.

IPG also contends that the Board's practice itself violated the Board's statutory obligation to follow precedent established by prior determinations. *See* 17 U.S.C. § 803(a)(1). But no contrary precedent binds the Board. IPG cites one past proceeding in which MPAA was required to produce individual "program certifications" to substantiate its authority to represent various claimants. *See* 66 Fed. Reg. 66,433, 66,449 (Dec. 26, 2001). In that proceeding, however, MPAA had apparently provided no evidence of its authority to represent the claimants before it was required to do so. *See id.* Here, in contrast, MPAA supplied agreements with the claimants' agents, and the Board had no reason to doubt the authenticity of those agreements.

B

IPG also challenges as arbitrary and capricious the Board's dismissal of several of IPG's claims in the program suppliers category. That contention lacks merit for several reasons. First, the Board reasonably found that IPG's flimsy evidence – including ambiguous emails and unexecuted copies of agreements – was insufficient to establish IPG's authority to represent certain claimants. Second, as we have already explained, the Board did not hold IPG to a higher standard than it held MPAA.

IPG also claims that the Board's treatment of IPG's claims violated IPG's procedural and substantive due process rights. But IPG raises those arguments in a cursory fashion, without relevant citations to the record or references to relevant case law or other authority. We therefore decline to entertain those arguments. *See Davis v. Pension Benefit Guaranty Corp.*, 734 F.3d 1161, 1166-67 (D.C. Cir. 2013) (party may not "mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones") (internal quotation marks omitted); *Railway Labor Executives' Association v. Railroad Retirement Board*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984) (court may decline to address cursorily raised issue where party fails to discuss relevant statutory text or case law).

C

During the Phase II proceeding, IPG and MPAA proposed dueling methodologies for calculating the relative marketplace value of their claims and allocating royalty fees within the program suppliers category. *See* 78 Fed. Reg. at 64,993-65,003. The Board ultimately relied heavily on

MPAA's methodology. *See id.* at 65,002. IPG argues that the Board was wrong to do so for five reasons.

*First*, IPG claims that during discovery MPAA withheld important information underlying its methodology. In IPG's view, the Board's denial of IPG's motions to compel production of that data – and the Board's subsequent reliance on MPAA's methodology – was arbitrary and capricious.

In royalty fee distribution proceedings, when methodologies are offered into evidence, the "facts and judgments upon which conclusions" drawn from the methodologies "are based shall be stated clearly, together with any alternative courses of action considered. Summarized descriptions of input data, tabulations of input data and the input data themselves shall be retained." 37 C.F.R. § 351.10(e). A party may object "that an opposing party has not furnished unprivileged underlying documents." *Id.* § 351.10(f).

According to IPG, MPAA flouted its obligation to preserve and produce information about its methodology in two respects: by withholding certain relevant files, and by failing to produce a document that IPG referred to as MPAA's "final integrated study." IPG Br. 45. IPG's expert witness described those materials as necessary to test the validity of MPAA's methodology. But MPAA's expert witness contested that conclusion. He explained that MPAA had "turned over" the "exact specification" of its methodology, and that an independent team had been able to replicate his work using the same materials. June 4, 2013 Hearing Tr. at 509-11, Joint Appendix at 3564. MPAA's expert witness also denied that a final integrated study existed and clarified that IPG's request was based on a misunderstanding of MPAA's methodology.

We review the Board's discovery determinations with "extreme deference." *Cf. Hi-Tech Furnace Systems, Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000) (internal quotation marks omitted). Applying that deferential standard, we conclude that the Board reasonably credited MPAA's expert witness's testimony that MPAA had complied with its duty to preserve and produce information related to its methodology. As a result, the Board's denial of IPG's motions to compel was not arbitrary and capricious.

*Second*, IPG contends that MPAA's methodology employed an approach barred by prior determinations and that the Board therefore erred by adopting that methodology. *See* 17 U.S.C. § 803(a)(1). Because the Board complied with the applicable precedent, IPG's claim fails.

MPAA's methodology relied on household viewership data to allocate royalty fees in the program suppliers category. *See* 78 Fed. Reg. at 64,993. The Board (or its predecessor entities) has previously questioned the appropriateness of relying exclusively on viewership data in the Phase I context. *See, e.g.*, 69 Fed. Reg. 3,606, 3,609, 3,612-16 (Jan. 26, 2004); 57 Fed. Reg. 15,286, 15,301-302 (Apr. 27, 1992). But as the Librarian has explained, different considerations apply in Phase I and Phase II proceedings. *See* 66 Fed. Reg. 66,433, 66,453 (Dec. 26, 2001) (approach to calculating marketplace value favored in Phase I proceedings "does not translate well to a Phase II proceeding dealing with one program category"). In the Phase II context, viewership remains "significant to determining the marketplace value" of programming. *Id.* at 66,447; *see id.* at 66,451 (viewership of programs "is probative in assessing their value in a Phase II proceeding").

The Board's acceptance of MPAA's viewership-based methodology was therefore consistent with precedent from past Phase II proceedings.[8]

*Third*, IPG asserts that the Board ignored yet another line of precedent in reaching its decision to adopt MPAA's methodology. Once again, however, the Board appropriately followed precedent established by prior determinations in reaching its final determination in the 2000-03 proceeding.

The precedent cited by IPG involves the so-called "zero viewing problem." 78 Fed. Reg. at 64,995 (internal quotation marks omitted). The problem is this: Viewership surveys – MPAA's source of data – occasionally indicate that no viewers watched a particular program. *See* 66 Fed. Reg. at 66,449. But a "zero viewing" result does not mean that no one actually watched the program. Instead, zero viewing simply indicates that no one *recorded* in the viewership survey that they watched the program. *See id.*

During the 1993-97 distribution proceeding, MPAA presented evidence riddled with zero viewing data points. The Librarian of Congress described that as an "egregious" deficiency in MPAA's methodology. *Id.* After MPAA failed to account for the zero viewing problem with persuasive expert testimony, the Librarian concluded that MPAA's methodology was unreliable. *See id.* at 66,450. The Librarian advised MPAA that in the future it should

---

[8] The Board did not accept MPAA's methodology wholesale, however. It recognized that the viewership-based approach suffers from certain limitations. *See* 78 Fed. Reg. at 64,995. In response to some of IPG's objections to MPAA's methodology, the Board adjusted the royalty fee allocation in IPG's favor. *Id.* at 65,003.

> present convincing evidence, backed by testimony of a statistical expert, that demonstrates the causes for the large amounts of zero viewing and explains in detail the effect of the zero viewing on the reliability of the results of the survey. In addition, MPAA needs to take steps to improve the measurement of broadcasts in the survey to reduce the number of zero viewing hours, thereby increasing the reliability of its study.

*Id.*

In the 2000-03 proceeding, the Board concluded that MPAA had heeded the Librarian's advice. MPAA "provided adequate evidence to demonstrate, to the satisfaction of the [Board], that the incidence of so-called 'zero viewing' does not preclude the [Board's] reliance" on viewership data, "subject to adjustments in the allocations to acknowledge some imprecision arising out of the 'zero viewing' sample points." 78 Fed. Reg. at 64,995. The Board gave credence to MPAA's explanation that zero viewing results are "important elements of information, rather than defects in the process." *Id.* The Board also accepted expert witness testimony that "when those zeros are included with non-zero data from the sample in a regression that correlates local and distant viewing, the zeros are placed in an appropriate statistical context." *Id.* Ultimately, after weighing all of IPG's objections, the Board gave substantial weight to MPAA's methodology, subject to adjustment to account for "certain imperfections" in that methodology. *Id.* at 65,002.

All in all, the Board reasonably concluded that MPAA presented the sort of "convincing evidence" that precedent required. 66 Fed. Reg. at 66,450. The Board therefore did not violate its statutory obligation to follow precedent

established by prior determinations by accepting the results of MPAA's methodology.

*Fourth*, IPG contends that the Board ignored a significant defect in MPAA's methodology. MPAA mistakenly failed to include certain data related to Canadian and Mexican television stations in its calculations. *See* 78 Fed. Reg. at 64,997. When the Board reviewed the data provided by IPG, however, the Board concluded that the error did not disproportionately harm IPG and skew the royalty fee allocation in MPAA's favor. *Id.* at 64,998 (error "did not have a significant effect on the relative shares computed by MPAA"). In other words, the Board found that MPAA's error was harmless and declined to increase IPG's royalty fee award. In IPG's view, the Board's conclusion was arbitrary and capricious.

Should MPAA have fixed its error? Perhaps. But the Board reasonably concluded that IPG did not suffer harm from the error. The Board "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Thus, the Board permissibly elected not to increase IPG's award in response to a minor error in MPAA's methodology.

*Fifth*, IPG claims that by accepting MPAA's methodology the Board improperly attributed several programs to MPAA, rather than to IPG. IPG cites one example ("Critter Gitters"). But IPG does not develop that argument, and we see no basis for upsetting the Board's determination on that ground.

22

* * *

We affirm the Board's determination as to IPG's royalty fees in the sports programming and program suppliers categories.

*So ordered.*